427 So.2d 678 (1983)
Edward WALKER
v.
Hillard MARCEV and New Orleans Public Belt Railroad and ABC Insurance Company.
No. 12586.
Court of Appeal of Louisiana, Fourth Circuit.
February 10, 1983.
Rehearing Denied March 24, 1983.
*680 Warren M. Schultz, Jr. of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant-appellant.
Michael K. Fitzpatrick, New Orleans, for plaintiff-appellee.
Before SCHOTT, GARRISON, KLEES, CIACCIO, and WILLIAMS, JJ.
CIACCIO, Judge.
This is an action to recover damages for personal injuries sustained by the plaintiff, when the car he was driving was struck by a train owned by the New Orleans Public Belt Railroad and operated by Hilliard Marcev, the engineer. After a trial on the merits, judgment was rendered in favor of the plaintiff and against Public Belt Railroad in the amount of $266,954.24. The court dismissed the action against the defendant-engineer, Hilliard Marcev. Defendant, New Orleans Public Belt Railroad, appeals the judgment.
Several issues are presented for our review. They include the right of the trial judge to restrict the physical examination of the plaintiff; the liability of the defendant railroad; the causal connection of the plaintiff's injuries to the accident; and the amount of the trial court award.
The record reveals that on the morning of March 24, 1976, at approximately 6:45 A.M., the plaintiff was driving to work at Southern Scrap Co. He was proceeding in the right hand lane of Harbor Road, between France Road and the Industrial Canal, at the point at which the Public Belt Railroad tracks cross Harbor Road. The railroad crossing was unmarked at this point. The plaintiff's car was struck on the right front quarter by the knuckle of the last gondola car of the train. At the time of the accident, the train, which consisted of eighteen cars, was being backed up by the engineer, Hilliard Marcev, from a formerly stationary position near Harbor Road. The vehicle driven by the plaintiff was pushed clear of the tracks. As a result of the accident, the plaintiff struck his head and right chest against the steering wheel, sustaining injuries to his upper torso which allegedly caused plaintiff to become impotent.
The first contention of the defendant, New Orleans Public Belt Railroad, is that the trial court erred in denying its motion to have the plaintiff examined by Dr. R. Prosser Morrow, Jr., a urologist.
The trial court is afforded wide discretion in granting physical examination *681 of parties litigant and in setting the guidelines for such examinations. C.C.P. Art. 1493. The court may subject the examination to reasonable restrictions or conditions, if special circumstances are shown. Robin v. Associated Indemnity Co., 260 So.2d 118 (La.App., 3rd Cir.1972) rev., other grounds 297 So.2d 427 (La., 1973). There exists a presumption that the physician in personal injury actions, will properly conduct his physical examination of the plaintiff. Simon v. Castille, 174 So.2d 660 (La.App., 3rd Cir., 1965) app. den. 247 La. 1088, 176 So.2d 145, cert. den. 382 U.S. 932, 86 S.Ct. 325, 15 L.Ed.2d 344.
In this case, the trial court denied a defense motion to have the plaintiff examined by Dr. Morrow. The reason for the denial was because of an alleged personality conflict between this physician and counsel for the plaintiff. The court directed the defendant to present an alternate choice of a physician. The defendant suggested Dr. Richard Levine, a urologist, and the court approved this request. Dr. Levine examined the plaintiff, testified during the trial as an expert witness specializing in urology, and concluded that the plaintiff's impotence was not caused by the accident. Although the grounds for the objection to Dr. Morrow asserted by the plaintiff were insufficient to justify his rejection by the trial court this error did not prejudice the defendant. In the absence of evidence demonstrating that Dr. Morrow was uniquely qualified to perform the examination, or that no other specialist with similar qualifications was available to defendant, we must assume that selection and use of Dr. Levine cured the trial court's error.
The defendant Railroad contends that the accident was not caused by any negligence on its part but resulted solely from the plaintiff's negligence. The defendant reasons that under the applicable state and local legislation, it has no duty to place warning devices at a switch track in an urban area such as the Harbor Road grade crossing. R.S. 45:562 repealed by Acts 1982, No. 669 § 3, now 32:169, C.C.S.Art. 53-35 (Ordinance 14,114, Sec. 2). Thus, it concludes that its failure to place warning devices at this location cannot subject it to liability for this accident.
Generally a railroad is not required to place warning devices to alert approaching motorists of the crossing, unless there are unusual and dangerous conditions at the crossing which makes such precautions necessary. Plummer v. Gulf M & NR. Co., 153 So. 322 (La.App., 1st Cir., 1934). When such precautions are warranted, the railroad must protect the crossing in a manner commensurate with the dangers involved. Aaron v. Martin, 167 So. 106 and 172 So. 840 (La.App., 1st Cir., 1936), aff. 177 So. 242 (La., 1937).
The trial court found that Harbor Road was the sole artery of travel for some three hundred employees who worked at Southern Scrap Company, as well as for employees who worked at two other companies in the area. This factor would create an unusual situation necessitating the railroad to provide adequate precautions to warn the passing motorist. The court further found that there was a dispute as to whether or not the fusees claimed to have been thrown on the roadway were ever ignited. The court found that the Railroad was blatently negligent for not having any signaling devices at the crossing where the accident took place. Appellant argues that there is no legal requirement under state law nor under city ordinance which would require installation of signal devices or warnings at this crossing. R.S. 45:562 repealed by Acts 1982, No. 669 § 3, now 32:169. 562 C.C.S. Section 53-35 (Ord. No. 14,114 Section 2).
Assuming arguendo that there was no requirement by statute or ordinance to place warning signals or devices at this crossing, there was a duty to warn approaching motorists by a watchman.
The city ordinance Section 53-35 (C.C.S. Ord. No. 14,114 Sec. 2) provides:
Section 53-35. Automatic signal lights required at street crossings.
"Every railroad company operating within the city shall at all points where its rail or rights of way cross or intersect a *682 paved street situated in the city, provide and maintain automatic signal lights of an approved design, which shall be kept in constant operation at all times, except that at crossings where watchmen are stationed continuously by any such railroad company it shall not be necessary to provide such automatic signal lights."
The stationing of a train foreman in a gondola car twenty-five feet from the roadway and the throwing of lighted fusees on the roadway is not compliance with the ordinance. The record supports the court's findings that there was a duty to warn and that the defendant Railroad did not meet its duty. The findings of the trial court in this regard are not clearly wrong. We find no manifest error.
The defendant argues that the plaintiff was negligent in that he did not stop, look and listen at the railroad crossing and he did not yield the right of way to the train. He contends that this constitutes contributory negligence which precludes plaintiff's recovery.
The failure of a motorist to come to a complete stop before crossing a railroad track does not preclude recovery, unless it appears that the failure to stop was the proximate cause of the accident. Aaron v. Martin, supra. That is, a motorist has a duty to stop, look and listen when approaching a railroad crossing. Pearce v. Missouri Pacific Railroad Co., 143 So. 547 (La.App. 1st Cir.,1932). However, the motorist will not be held guilty of contributory negligence so as to bar recovery, if he keeps a proper lookout upon approaching the crossing and has his car under such control as to be able to come to an immediate stop if necessary, and provided further, that it reasonably appears from the circumstances of the particular case that the accident would have been avoided had the motorist come to a complete stop. Sule v. Missouri Pacific R.R. Co., 181 So.2d 280 (La.App.,4th Cir.,1966), writ den. 248 La. 916, 182 So.2d 664 (La.,1966), cert. den. 385 U.S. 819, 87 S.Ct. 46, 17 L.Ed.2d 58, reh. den. 385 U.S. 983, 87 S.Ct. 498, 17 L.Ed.2d 447 Dobrowolski v. Holloway Gravel Co., Inc., 173 So. 474 (La.App., 1st Cir., 1937).
The trial court concluded that the plaintiff was not contributorily negligent. It found, as a matter of fact, that the plaintiff approached the crossing in a very cautious and slow manner and that the train was stopped. The court found that the plaintiff observed this and he was struck when the engine activated the train in a backing motion as plaintiff proceeded across the tracks. A careful review of the record satisfies us that the conclusions of the trial court in this regard are not clearly wrong. When the plaintiff approached the crossing, the train had already stopped near the crossing area and was motionless. The plaintiff had no warning that the train would start up and back across the tracks. Even if the plaintiff had stopped we are not satisfied that the accident could have been avoided. The trial court was not manifestly erroneous in its conclusion that the plaintiff was not contributorily negligent and that the sole and proximate cause of the accident was the negligence of the defendant, New Orleans Public Belt Railroad.
The defendant further argues that the trial judge erred in finding that the train accident caused the plaintiff's impotency. The defendant suggests that Dr. LaNasa's testimony only presents the accident as a possible cause of the impotency, not a probable cause of the condition.
The plaintiff was examined personally, or through his records, by numerous physicians. The extent of the examinations and the diagnoses reached were at great variance. A chronology of the medical testimony will facilitate a resolution of this issue.
The record reveals that the plaintiff had a pre-existing condition of pancreatitis, for which he underwent surgery in 1959. Thereafter, he suffered intermittent residual effects of stomach spasms and vomiting.
On May 8, 1976, the plaintiff was examined by a general practitioner, Dr. George Jenet. The plaintiff gave Dr. Jenet the history of the train accident. He complained of pains in his chest. Dr. Jenet testified that he was not told by the plaintiff *683 of abdominal pain, nor of shooting pains in the chest. He did not conduct a neurological examination. The plaintiff's blood pressure was found to be elevated. Dr. Jenet diagnosed the plaintiff's condition as hypertension. He prescribed Regroten for the elevated blood pressure and CoTylenol for the pain.
On July 26, 1976, the plaintiff was treated on one occasion by Dr. Ambrose Pratt, a surgeon. Plaintiff complained of pain in his right rib area which travelled from the mid chest into the right groin. An examination of the plaintiff's back and extremities revealed no tenderness to palpation. There were no complaints concerning the area of the hernia. No gross neurological deficits were discovered. Mr. Walker also complained of intermittent pain in the right chest. Dr. Pratt took a history, wherein it was noted that the patient had been examined medically two weeks before. Dr. Pratt diagnosed the plaintiff's injuries as a contusion of the right anterior rib cage, attributable to the accident of March 24, 1976.
Plaintiff developed a bilateral hernia. He was operated on for this condition at Charity Hospital in January, 1977. The plaintiff testified that it was during this time that he was advised, after x-rays, that he had a fractured rib. In early 1977 the plaintiff was found to have diabetes mellitus, thereafter requiring him to take daily insulin injections.
On April 27, 1977, the plaintiff was examined by Dr. Henry Braden, a general surgeon. After taking a history from the plaintiff, he sent plaintiff to Dr. Norman Hunt for x-rays. The x-rays revealed no fractures at the time. The blood sugar test of the plaintiff was normal. His blood pressure was within normal limits. The plaintiff did not mention that he suffered from impotency. Dr. Braden testified that the plaintiff complained of pains in his right chest but did not mention hypertension. Dr. Braden stated that the plaintiff's spasms of the stomach could be associated with pancreatitis, hepatitis or a nervous stomach. The incident of vomiting could result from spasms of the stomach, ingestion of material or pressure on the abdominal wall. He further stated that the right inguinal hernia could be congenital or could result from a blow from the outside or strain. The hernia could also be caused from stomach spasms resulting from pancreatitis or hepatitis. He did not know what caused the hernia, but it was his opinion that inguinal hernias result from strain on the abdomen, as opposed to a blow to the abdominal region.
Plaintiff's attorney did not learn of plaintiff's impotency until December 6, 1978, the morning this case was originally set for trial, whereupon the court continued the trial in order to allow the plaintiff to be examined by a urologist. On April 11, 1979, plaintiff was examined by Dr. Joseph LaNasa, a urologist with a sub-specialty in andrology.
By way of history, Dr. LaNasa noted that the plaintiff was married for 29 years and had 13 children ranging in ages from 11 years to 29 years of age. He engaged in sexual intercourse with his wife on a frequent basis prior to his auto accident. At the time of the accident he sustained a blow to rib # 8 which corresponded with the thoracic spine # 10-11. The plaintiff alleged that since the accident he had not had an erection. The history also confirmed plaintiff's condition of diabetes mellitus, operations for pancreatitis and inguinal hernia.
Dr. LaNasa tested the plaintiff with a cystometrogram and discovered no nerve damage, nor damage to the bladder. The urine flow was normal. He concluded that diabetes was not causing the impotency, because there was no bladder pathology. At the request of Dr. LaNasa and pursuant to the instruction of his associate, on two nights the plaintiff administered a test to himself by use of a tumescence monitoring device. The readings showed that the plaintiff had no erections. This indicated to Dr. LaNasa that the cause of the plaintiff's problem was not psychological.
Dr. LaNasa concluded by induction that the plaintiff's condition was possibly the result of trauma. He reasoned the blow to *684 the right chest in the area of rib # 8 could have travelled to the spinal area of the thoracic spine # 10 through 12 causing an anterior herniated disc in that area. He further deduced that the extrusion of the disc in this area could have affected the nerves S# 2-4 which control the penis. Dr. LaNasa testified that the plaintiff had a normal bulbocavernous reflex, deep tendon reflexes were normal, as were the peripheral nerves. There was no tenderness found in the examination of the back. He stated that he did not perform a pelvic arteriogram, therefore he could not rule out vascular problems. He stated that certain blood pressure medicines could cause impotency, but Retrogen should not. He said, however, that Aldomet, an anti-hypertensive medicine, could cause impotency. Dr. LaNasa testified that excessive alcohol could cause impotency, but only temporarily, and it was his understanding that the plaintiff had stopped drinking in 1959. Dr. LaNasa concluded that the trauma was the most plausible cause of the plaintiff's impotency.
Pursuant to a defense request, the plaintiff was examined on June 13, 1979, by a second urologist, Dr. Richard Levine. After taking a history of the patient, Dr. Levine conducted a physical examination. He noted several surgical scars on the patient and a left inguinal hernia. He stated that the plaintiff did not complain of back pain and the physical was normal in all other respects. From the history Dr. Levine concluded that the plaintiff was impotent. Dr. Levine further concluded that the plaintiff's condition resulted from diabetes. He testified that diabetes can cause nerve damage or vascular problems which result in impotency. He stated that the cystometrogram administered pursuant to Dr. LaNasa's request would resolve the issue of diabetes causing neurological problems which result in impotency, but it would not answer whether the disease affected the vascular system. Dr. Levine testified that it is very remote that the trauma of the accident could have caused the impotency because such a blow should also have affected the nerves that control the bladder, sphincter tone and bulbocavernous reflex. He stated that he could not prove that trauma did not cause the impotency.
The plaintiff was examined by Dr. William Super, a psychiatrist. Dr. Super testified that the plaintiff relayed to him feelings of frustration, depression and irritability from his impotency. He was prescribed Elavil which did not help him because it interrupted his sleep. The plaintiff was found to have no psychosis, delusions nor hallucinations. He had no brain damage and could relate to time, place, and persons. The psychiatrist stated that no specific diagnosis was made, but he found the plaintiff to be suffering from a moderate depressive reaction which was attributable to his impotency. He testified that the impotency was organically caused, not psychologically caused. The plaintiff would continue to suffer from depression and marital problems which could get worse.
Dr. William Martin, a neurologist, did not examine the plaintiff nor his Charity Hospital medical records. Dr. Martin's conclusions were made on the basis of a review of the plaintiff's medical examinations and evaluation by Dr. Pratt, Dr. Braden and Dr. Levine. He also reviewed Dr. LaNasa's deposition. He concluded that the plaintiff's impotency was caused either by a direct trauma to the penis or by a vascular malfunction caused by the diabetes. The reason for his conclusion was that a normal cystometrogram and bulbocavernous reflex would virtually negate disease of nerves S# 2-4. He testified that a blow to the chest would not affect spinal cord nerves S# 2-4. He posited that if one of these nerves was affected, all of them should be affected. The bladder, as well as the penis, would be affected if the impotency was neuropathic. However, with vascular complications, the penis alone would be affected.
The plaintiff must prove by a preponderance of the evidence that the damages he sustained were caused by the fault of the defendant, Jordan v. Travelers, 257 La. 995, 245 So.2d 151 (La.,1971).
*685 The weight to be afforded the testimony of an expert is largely dependent upon his qualifications and the facts upon which his opinion is based. Middle Tennessee Council, Inc., Boy Scouts of America v. Ford, 274 So.2d 173 (La.,1973). The trial judge may accept or reject an opinion expressed by any medical expert depending upon how he is impressed with his qualifications and testimony. Guidry v. Davis, 382 So.2d 250 (La.App., 3rd Cir.,1980). Where there exists a difference of medical opinion, the conclusion is largely a credibility question which will not be overturned absent manifest error. Necaise, Inc. v. Vicknair, 391 So.2d 1347 (La.App., 4th Cir.,1980). However, in order to be probative, medical evidence must meet the standard of proof of being "more probable than not", of its existence. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Edwards v. Government Employees Ins. Co., 356 So.2d 449 (La.App., 1st Cir.,1977).
The trial court, in its reasons for judgment, made the following statement concerning the causal connection between the accident and the plaintiff's injuries:
"To save going into the great detail of his medical testimony, this court adopts his reasons that the trauma in this accident caused plaintiff Walker impotency for those medical reasons and medical conclusions testified to by Dr. LaNasa." (Tr. 772).
This statement by the trial court was clearly wrong, and is unsupported by the record. Dr. LaNasa did not testify that the "trauma in this accident caused plaintiff Walker's impotency." He never testified that it was more probable than not that the trauma caused the impotency nor did he say that this was a reasonable probability. Rather, Dr. LaNasa only testified that this was a "possible" explanation of the impotency or that the accident "could" be an explanation.
Although the trial judge gave Dr. LaNasa several opportunities to testify that the trauma to the rib cage was the cause of plaintiff's impotency, Dr. LaNasa declined to make such a judgment and limited his opinion to the areas of "possible" and "plausible".
When questioned on direct examination concerning the accident, Dr. LaNasa testified:[1]
At Page 387
"Q. Where did you point to?
A. The 8th rib is about down in here. (Indicating)
Q. A blow into what area?
A. To the 8th rib area. It could have transmitted the blow back to the T-10 or T-11 and this could have caused a sublexation or change in the vertebral alignments such as having a normal posterior herniation of a disc space. Those are the fibers that separate the vertebral bodies. They could have been pushed out entirely and that is why he had a selective damage possibly only to the sacral complex."
At Page 397
"A. This again further confirms that he did not have psychological causes as a basis of this impotency. Since we felt the other principle cause could have been diabetes and we ruled that out, I think it is a plausible explanation that the trauma could have led to an anterior displacement of one of the inner vertebral discs that controls the erection." (Emphasis supplied)
At Page 398
"By Mr. Fitzpatrick:
Q. From the history that you took, Doctor, and from the tests that you made and from all of your involvement, in your estimation what do you think is the cause of Mr. Walker's impotency?
A. Not being able to examine the man before the accident and certainly not seeing him immediately after the accident, I have to go by history and what my findings are based on the time reference that I saw him, *686 I feel there is a possible explanation and certainly even probable explanation that a traumatic episode could have produced the conditions that are present now..."
At Page 409:
"Q. In your opinion is it likely that this happened in this case?
A. Again I can only go to the history and physical findings as one possible explanation for it and that is all I can interpret for you, that is all I am qualified to do. I cannot tell you that is the only cause and I can't say that is the cause, but that is a plausible explanation for the man's problems.
Q. You can't say that is the cause?
A. I don't think anybody can say that is the cause, just like nobody can say that is not the cause..."
At Pages 419-422:
"The Court:
And you have ruled out
The Witness:
That the bladder nerves are damaged, that the rectal nerves are damaged.
The Court:
You have ruled out the fact that diabetes has caused his impotency
The Witness:
Right.
The Court:
You have ruled out the psychological factor:
The Witness:
Right. And ruled out the drug history.
The Court:
And you said very carefully it is probably that a traumatic episode could have caused this impotency?
The Witness:
Right.
The Court:
And you are not able to unequivocally state because a test has not been developed to test the nerves to the penis?
The Witness:
Correct. If I operated on him I can go ahead and [stimulate] each nerve at the time of surgery but that is not a practical way to do it.
The Court:
If I am not correct please correct me, but I understand that you feel it is more probable than not that the trauma involved in this accident is the cause of this man's impotency?
The witness:
Ruling out all the other causes to the best of my knowledge I have to say that is possible. I never examined the man before the accident so I have to put that statement in there.
The Court:
But from my side, am I wrong medically, and unfortunately I have to be a ruler of medicine
The witness:
I would be putting words in your mouth if I told you without a doubt that is what caused it and if I am going to be an expert
The Court:
I understand fully, but when I say medically, if we take the history of this man being highly sexually active with the number of pregnancies prior to the trauma and the testimony that he has given that he and his wife very often used their sexual activities and then we have a trauma and then we have impotency and you rule out medically the other things, you sort of arrive at some deductive logic? You can't say unequivocally it was but you say it is probably that a trauma could have caused the situation and it is up to me, I guess, to assess your information with the rest of the facts that I have as to what I conclude?
The Witness:
Correct.
BY MR. SCHULTZ:
Q. Now, you didn't nevertheless find any evidence of nerve damage in this case?
A. Not that I can measure.
*687 Q. No objective evidence of nerve damage?
A. Correct. Subjective evidence only.
Q. And the mere fact that appears from the tests you ran the man is impotent doesn't by itself lead to the conclusion that he had nerve damage associated with the erectal function?
A. By inference that I cannot find another cause that is more plausible, I have to, yes.
Q. You haven't been able to detect any other cause by tests that you conducted?
A. Right."
At Page 454.
"Q. And I believe as I read from your deposition that you can't really say which is the cause and which isn't, is that correct?
A. Correct.
MR. SCHULTZ:
No further questions.
The Court:
But then in this case you feel that it is probable that a traumatic episode caused his impotency?
The Witness:
That is the most plausible explanation I can come up with."
Dr. LaNasa's testimony did not establish with "a reasonable probability" that the trauma of the accident caused plaintiff's impotency. He did not require a pelvic arteriography test which would have established whether or not vascular problems existed in the penis. (Tr 435-436.) Neither did he require plaintiff to undergo a myelogram or discogram to confirm his theory of a compression or herniated disc. (Tr 438) Dr. LaNasa, although a specialist in urology and andrology, is not a specialist in neurological diseases of the spinal cord. His speculations in this area were outside his realm of expertise and were based upon limited and inconclusive testing. This opinion testimony does not meet the standards of proof required of medical witnesses and is too speculative to form the basis for a finding of a causal connection between the plaintiff's impotency and the subject accident. Moreover, no other expert testimony was offered to support such a finding. In fact, Dr. LaNasa's theory is overcome by the positive contradictory testimony of Dr. Martin, a neurologist, who does specialize in diseases of the spinal cord and nervous system.
Dr. Martin concluded that the impotency was caused by the diabetes, which had resulted in a vascular malfunction. He ruled out the accident as a cause because he said that the same nerves that controlled the bladder controlled the erection of the penis and there was no evidence of bladder malfunction.
Dr. Martin testified
At Pages 513-515:
"BY MR. SCHULTZ:
Q. Can you tell us what part the human body's nerves play in impotency?
A. Well, potency is a complicated subject. When [you're] speaking of potency, you are speaking first of a psychological aspect which arises in the brain and then the messages from this psychological aspect are passed down the various passages in the spinal cord and through the [penis] as action of the autonomic nervous system which is a sympathetic and parasympathetic input. The nerves themselves which are directly responsible for a penile erection are the sacral 2nd, 3rd and 4th nerves in the parasympathetic division. These nerves are also made of fibers. They go to skeletal muscles and sensory fibers which are considered different parts of the nervous system.
Q. Do the sacral 2, 3 and 4th nerves control other body functions as well as penile erection?
A. The sacral 2, 3 and 4 nerves are distributed to the bowel as well as the urinary bladder and probably to some degree the vascular system.
Q. Does it also control the bulbocavernous reflex?
A. They are to a degree. That is a complicated reflex.
Q. Where are the sacral 2, 3 and 4 nerves located?
*688 A. They arrive at the tip of the spinal cord, the last sacral nerve arises from S5 and that is the very tip of the spinal cord. This is located behind the T12-L1 vertebra. The nerves arising from this area then transverse the spinal canal through the lumbar and sacral region and emerge from the sacrum at 2, 3 and 4.
Q. Can impotency result from a trauma?
A. Can impotency result from a trauma to the foot, the arm?
Q. As a general principle?
The Court:
Trauma where? He is asking where the trauma is.
By Mr. Schultz:
Q. Well, I think my question is more fundamental than that. Isn't it true that trauma can cause impotency in the human male?
A. Trauma can cause impotency if it involves the spinal cord, yes."
At Page 516:
"Q. Can a trauma that results in an anterior compressed disc cause impotency?
A. An anterior compressed disc? As far as I know there are no nerves that run anterior to the spine. The nerves run posterior-laterally, and I don't know how an anterior disc, which would be very rare to start with because they usually don't rupture in that direction, I don't know how that would cause any neurological symptoms."
At Pages 519-520:
"By Mr. Schultz:
Q. Now, Doctor, in a case where a man is involved in an accident, the sort of accident we just described, and he never has had any complaints, I am asking you to assume these things. Assume he never had any complaints of back pains and various studies conducted by the various physicians and you have reviewed Dr. LaNasa's deposition which shows that his bladder functions normally, his bulbocavernous reflex functions normally, his rectal sphincter tone is normal and his deep tendon reflexes is normal and his only complaint is that he is impotent and he has pain in his right anterior rib cage, in your opinion what is the likelihood that this kind of a trauma caused that impotency? ... (Objection overruled and deleted)
By Mr. Schultz:
Q. I am speaking about resulting in nerve damage to the penile erection function?
A. The presence of a normal cystometrogram and a normal bulbocavernous reflex virtually eliminates any possibility that there can be any disease involving the S2, 3 or 4 nerve roots. (Emphasis supplied)"
At Pages 527-528:
"Q. Are you saying that when you see someone who has impotency that is neurogenically caused that there are other neurogenic deficits as well?
A. They are definitely because they are usually referred to me because of other reasons [than] impotency.
Q. Have you ever seen where the bladder function was normal?
A. Have I seen cases of neurogenic impotency where the bladder functions were normal? I don't recall seeing a case of neurogenic impotency where the bladder function was normal.
The Court:
Normally when there is a neurogenic impotency it is always a bladder malfunction?
The Witness:
A. They are both controlled by the same S2, 3 and 4 roots and as we illustrated, if you involve the spinal cord and roots you are going to get the bowel, bladder, et cetera.
The Court:
On the other side of the coin, since they are controlled by the S2, 3 and 4 nerve roots which are causing an impotency situation, it would also be causing a neurogenic malfunction of the bladder?
The Witness:
A. Almost always. I would also say always. (Emphasis supplied)
*689 The Court:
That is why he ruled out diabetic impotency in this situation."
At Pages 531-532:
"The Court:
If a person is suffering impotency from diabetes, what is the general rule? Would there also be malfunction in his bladder?
The Witness:
A. If the impotency is secondary to neuropathy the bladder will be affected together with the penis. If the impotency is due to vascular complications, the bladder may well function perfectly, normal and the patient still be impotent.
The Court:
Q. In this case Dr. LaNasa, the urologist, although saying that the vascular could be a possibility, ruled it out or not ruled it out, but his impression was more of the traumatic condition than the vascular. In other words, you agree in one area that from the nerve element, if the nerves are damaged and are causing impotency it would be most probably cause a bladder problem, is that correct?
The Witness:
A. Regardless of what causes the damage to the nerve, whether it is diabetic neuropathy, whether it is traumatic or INH neuropathy, the bladder will be affected together with the penis regardless of what the cause of the neuropathy is.
The Court:
Q. So now we know the impotency is not caused by damaged nerve?
The Witness:
A. All medical evidence tends to exclude that possibility."
At Pages 542-543:
"The Court:
Q. But break my query down one simplistic step. Disregarding the situs of the trauma to the body, can there be a neurogenic disorder of the penis induced by trauma and not also be a disorder to the bladder?
The Witness:
A. Within the realm of medical certainty, no.
The Court:
So therefore you say that if there is neurogenic disorder
The Witness:
A. Of any cause.
The Court:
Q. Either diabetic or trauma, it has to bilaterally attack both organs.
The Witness:
A. That is correct."
Dr. Levine's testimony agreed with the opinion of the neurologist and was contra to the opinion of Dr. LaNasa.
Dr. Levine testified at pages 482-485:
"Q. Now, did you make a diagnosis?
A. I made a diagnosis of impotency on his history. I also made a diagnosis of an incisional hernia and the right drain site and an incisional hernia in the abdominal incision and a left inguinal hernia.
Q. You based him as impotent on the basis of his history?
A. Yes.
Q. Did you recommend that further studies be conducted?
A. Yes.
Q. What did you recommend?
A. I recommended that the patient undergo a urologic examination consisting of a kidney test and test that shows how nerves to the bladder work and how the nerves themselves work and cystoscope to see what the inside of the bladder looked like. I also suggested that he be hooked to a tumescence monitor to see if he obtained an erection while he was sleeping.
Q. I would like you to make some assumptions today, Doctor. I would like for you to assume that in November of 1979 a tumescence monitoring was conducted on Mr. Walker for two nights and this was done by showing him how to attach the machine for himself and sending him home with the *690 machine and then having him bring the results back after he finished the two nights of this testing. I would like you to further assume that a cystometrogram was conducted by Dr. LaNasa earlier in 1979 and in April of '79 and that was found to be within normal limits. I would like you to further assume that Dr. LaNasa found Mr. Walker's bulbocavernous reflex was normal, that his deep tendon reflexes were normal and his rectal sphincter tone to be normal.
Q. Now, can you tell me when you tried to determine the cause of impotency what sort of things do you take into consideration?
Mr. Fitzpatrick:
Q. Is this part of the hypothetical question?
Mr. Schultz:
A. No, I have asked the doctor to make those assumptions and then I will ask the questions.
The Court:
He is to assume those hypothets and now this is the second part of the question.
By Mr. Schultz:
Q. Doctor, based upon all of those findings and based upon the fact that Mr. Walker is diabetic and takes insulin daily, do you have an opinion as to the probable cause of Mr. Walker's impotency?
A. I do.
Mr. Fitzpatrick:
Let me make an objection for the record at this time. The hypothet is not a complete hypothet.
The Court:
That is up to counsel to give a hypothet. If it is not complete that is her peril (e).
Mr. Fitzpatrick:
I withdraw the objection.
Q. I would like for you to assume that when the tumescence monitoring was done the results showed no erections for the two nights of monitoring. Assume the other matters, what is your opinion as to the probable cause of Mr. Walker's impotence as of 1979.
A. I think his most [probable] cause was his diabetes. (Emphasis supplied)"
The trial judge was clearly wrong in finding that the evidence offered by plaintiff to prove that his impotency was caused by the accident met the standard of "more reasonable than not", "more probable than not" or there must exist "a reasonable probability" of its existence as enunciated in Boudreaux v. American Insurance Co., supra; Jordan v. Travelers Insurance Co., supra and Edwards v. Government Employees Insurance Company, supra. The testimony of Dr. Martin, the neurologist, clearly contradicted and refuted the theory of neurological causation.
In awarding $265,000 in general damages the trial court reasoned that the plaintiff was forty-four years old at the time of the accident and would probably live to be seventy-one or seventy-two, hence "The Public Railroad robbed Walker of approximately a period of in excess of twenty-five years of being able to enjoy sexual activity with his wife."
The record does not support the conclusion of the trial judge, and this finding is manifestly erroneous and clearly wrong.
Accordingly, we find that plaintiff is not entitled to any award for damages for his impotency and the award for general damages must be amended to compensate plaintiff for those injuries which were caused by the accident. This award must be at the highest point which is reasonable within the discretion afforded the trier of facts. Carollo v. Wilson, 353 So.2d 249 (La.1977).
Plaintiff sustained a fractured rib, a contusion of the right chest area and some generalized bruises to his body. It is obvious he suffered some discomfort from these injuries and sought medical treatment from two physicians, Dr. Janet and Dr. Pratt, shortly after the accident. However, there was no medical testimony which linked the inguinal hernia, high blood pressure nor diabetes to this accident. There is, likewise, no evidence of permanent disability as a result of this accident. Under these circumstances, we consider the maximum amount of *691 general damages which are reasonable within the discretion of the trial judge in this case to be $5,000.00.
For the reasons assigned the judgment is amended to reduce the award for general damages to $5,000.00. In all other respects the judgment is affirmed. All costs of this appeal are assessed against the defendant, New Orleans Public Belt Railroad.
AMENDED AND AFFIRMED.
SCHOTT, J., concurs.
GARRISON, J., dissenting with written reasons to follow.
SCHOTT, Judge, concurring in the result.
I concur in the result and subscribe to that part of the majority opinion which deals with quantum and the conclusion that plaintiff failed to prove with legal certainty that his impotency was the result of the accident.
GARRISON, Judge, dissenting.
Although some of the testimony produced at the trial was in conflict, nevertheless there was competent evidence presented on which the court below reasonably could find that Mr. Walker's impotence was caused not by diabetes but by the accident at the railroad crossing. Because of the limitation on review placed upon this court, we should uphold the conclusion reached by the trial court.
Dr. Henry E. Braden testified that in his opinion Walker's diabetes was not a cause of his impotence. The court heard Dr. Braden testify, in particular, that:
"Well, different labs from eighty to one-twenty and his being seventy-six milligrams per cent would be normal and that in itself, if he had a blood sugar like this I would hesitate to say that his diabetes caused his impotency because I would that if he had it it was under control."
The court additionally heard the testimony of Dr. Joseph LaNasa, a specialist in the field of andrology. He was the only such specialist found in New Orleans able to give the court an opinion as to the cause of the plaintiff's condition. His evaluation of Walker included his having placed him on a tumescence monitoring device on two separate nights. Dr. LaNasa's testimony was to the effect that Mr. Walker was impotent and that this state was traumatically caused by the accident.
With regard to Walker's diabetes, Dr. LaNasa testified that most diabetics are potent and that, in point of fact, 60% of diabetics are not impotent.
The testimony of other physicians called to testify for Walker included that of Dr. Ambrose Pratt and Dr. George Jenet. Their testimonies had the effect of corroborating the causal relationship between the trauma to his rib cage received in the accident and the onset of the impotence.
On the other hand, the defendant's only examining urologist, Dr. Richard Levine, conceded that his specialty was not in andrology but that he dealt primarily with cancer. He testified, further, that he had diagnosed the plaintiff as being impotent and admitted that the type of trauma suffered by the plaintiff as the result of the accident could have caused his impotence. He stated that he had never reviewed Walker's Charity Hospital records. He admitted that a blow, such as that received by Walker in the accident, could be the proximate cause of his impotence.
Dr. William Martin, a defendant witness, who had only been retained by the defendant on the Saturday night during the weekend recess of the trial, acknowledged that he had only reviewed Walker's file for approximately one and one-half hours and that he had not reviewed any Charity Hospital records. He testified further that he was not aware that Walker had a fractured rib. Dr. Martin conceded that such a traumatic injury could cause impotence if the spinal cord was involved. He acknowledged that 50% of diabetics are potent. He concluded his testimony by stating that he was not a urologist but dealt primarily with diseases of the nervous system.
It is apparent that the trial judge concluded that there was sufficient evidence on which to base its opinion. Judge Early stated that:

*692 "The Court feels strongly that the plaintiff Edward Walker's impotency was in fact caused by the trauma of this accident. This Court goes on the record as adopting the testimony of Dr. LaNasa as the correct medical conclusion herein. The Court was most impressed by the testimony of Dr. LaNasa, who is the Acting Chairman, seemingly soon to be permanent Chairman of the Department of Urology at the LSU Medical School. In addition to having been classified by the Court as an expert in the field of urology, the Court was greatly impressed with the doctor's subspecialty in the field of andrology. In fact, this Court states in the record that in this regard that Dr. LaNasa has been one of the most impressive medical witnesses it has heard during its nearly eleven years on the bench."
The record in no way establishes that the court's finding was clearly wrong or manifestly erroneous. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Accordingly, we are left with the great weight which must be given to the factual conclusions of the trier of fact regardless of our own evaluations. See Canter v. Koehring, 283 So.2d 716 (La.1973). I dissent.
NOTES
[1] All underlining supplied for emphasis.