539 So.2d 70 (1989)
Drema MORRIS, et al.
v.
YOGI BEAR'S JELLYSTONE PARK CAMP RESORT, et al.
No. 88-CA-540.
Court of Appeal of Louisiana, Fifth Circuit.
January 18, 1989.
Rehearing Denied March 29, 1989.
Writ Denied May 19, 1989.
*71 Jan P. Jumonville, Ward & Clesi, New Orleans, for defendants/appellants Johnny Bouzigard, State Farm Fire and Cas. Co., The Sea Ins. Co., Ltd., and Mary Vizier Cheramie.
Michael A. Lombard & Scott E. Silbert, Lombard & Silbert, Metairie and Edward A. Shamis, Jr., Edward A. Shamis, Jr., P.C., Slidell for plaintiffs/appellees, Drema Morris, Parent and Guardian of Sherry Morris, Minor.
Before BOWES, GRISBAUM and WICKER, JJ.
BOWES, Judge.
This civil appeal arises from a suit filed by Drema Morris on behalf of her daughter Sherry Morris as a result of an alleged rape by three boys. A jury ruled in favor of the plaintiff but assigned 12% blame to Sherry Morris. We affirm.
On June 24, 1985, Drema Morris filed the first petition for damages in this action. After several supplemental and amended petitions, the following were made parties to the suit:
1. Yogi Bear's Jellystone Park Camp Resort
2. Mr. Camper, Inc.
3. Maurice LeBlanc
4. Darren Bouzigard and his parents, Dr. and Mrs. Johnny Bouzigard
5. Wade Galjour and his legal custodian parent, Mary Vizier Cheramie
6. Randy Cheramie, and his custodian parent, Mrs. Lorraine Cheramie
7. St. Paul Fire and Marine Insurance Company, the liability insurer of Jellystone, Mr. Camper, Inc., and Mr. LeBlanc
*72 8. State Farm Fire and Casualty Company, the liability carrier of Dr. and Mrs. Bouzigard and Mary Vizier Cheramie
9. The Sea Insurance Company Limited, the excess liability insurer of Dr. and Mrs. Bouzigard
The matter was tried before a jury from September 28 to October 8, 1987.
During the trial and prior to its completion, Yogi Bear's Jellystone Park, Mr. Camper, Inc., Mr. LeBlanc and St. Paul reached a settlement agreement with Mrs. Morris and were dismissed from the suit. The other defendants remained and the jury rendered a verdict against them. The jury found that Sherry Morris had been injured and assigned the blame as follows:

1. Yogi Bear's Jellystone Park - 10%
2. Darren Bouzigard - 38%
3. Wade Galjour - 22%
4. Randy Cheramie - 18%
5. Sherry Morris - 12%

The jury then awarded Mrs. Morris, on behalf of Sherry, Sixty Thousand ($60,000) dollars for special damages and One Hundred Eighty Thousand ($180,000) dollars for general damages.
Mrs. Morris filed a Motion for Partial Judgment Notwithstanding the Verdict, asking the trial court to eliminate the 12% fault attributed to Sherry. The motion was denied.
Dr. Johnny Bouzigard, The Sea Insurance Company, Ltd., State Farm Fire and Casualty Company and Mary Vizier Cheramie, petitioned for this appeal. Mrs. Lorraine Cheramie, who represented herself pro se, did not join in the appeal.
The relevant facts of this case are as follows. In June, 1984, Sherry Morris, 13 years old at the time, accompanied a friend, Rebecca Kennedy, and her family on a camping trip to Yogi Bear's Jellystone Park. On Saturday, June 22nd, Sherry had a doctor's appointment but returned to spend the evening at the campground. That afternoon, Rebecca told Sherry that her father, Tom Morris, was, in fact, not her true father but her adoptive father and this discovery made Sherry upset and angry.
That evening, after the two girls had completed their swimming activities and had taken their showers, they borrowed a radio from a friend of Rebecca's brother and walked around the campground. They arrived at the playground area and sat on a small bridge to listen to the radio. Three boys, Darren Bouzigard, Wade Galjour and Randy Cheramie, all 17 years of age, stopped to talk to the girls.
Rebecca's mother had the girls paged to the office so that she could give them the "check-in" instructions for the evening. They were to check in with her at the camper every half hour. Upon receiving the instructions, the girls returned to the bridge to speak with the boys once again. Sherry then sent Rebecca to buy her a pack of cigarettes at the ranger station. Upon Rebecca's return, the boys offered Sherry and Rebecca some beer, which they accepted. The girls got into a beer fight and spilled some of the first beer. Two of the boys then left to buy more beer; however, they couldn't purchase any at the campground because they were under age, but left the site on bicycles and found a store that didn't question their age and, in fact, sold them a case of beer.
The boys returned to the campground with the beer at which time they all drank more beer. Sherry left the others with Darren, apparently voluntarily, with his arm around her neck, to go to a small closed-in structure called Boo Boo's Playground. However, in Rebecca's testimony, she stated that she could not tell if Sherry was being forced to accompany Darren at that time, although Darren did have his arm around her neck. We conclude from all the circumstances that her departure was voluntary.
A few minutes later, Wade also left to go up to the structure, leaving Rebecca and Randy alone. After a few minutes, Rebecca suggested to Randy that they sneak up on the others and surprise them. As they approached the platform, one of the boys motioned for Rebecca to go away, but, before she turned away, she saw someone unzipping his pants. Rebecca testified that she could not see Sherry at this time as she *73 was inside "Boo Boo's Playground." Rebecca became confused as to what action she should take, so she went alone to the bathhouse where she sat in a stall for a short while trying to decide what to do.
A few minutes later, Rebecca returned to the playground and told Sherry they had to go check in with her mother. She testified that Sherry said, "All right, all right", in a muffled voice. One of the boys said Sherry would be down in about ten minutes. Rebecca then yelled to Sherry to meet her at the bathhouse. Rebecca then returned to the bathhouse to wait.
As she was leaving the bathhouse, she saw her brother who asked for the radio. She told him Sherry had it and returned to the inside of the bathhouse until her brother sent someone in to get her. He told her to get the radio and bring it to him. Rebecca returned to the playground and this time heard moaning and groaning and heard Sherry say, "Nono moreleave me alone." As she got nearer to the structure, Rebecca thought someone might be chasing her, or getting ready to do so, and she began to run and yelled for help for the first time.
Rebecca then saw a group of boys on bikes and told them, "Help me, help me. She is being raped. Just help me." The group was heading back towards the playground when Rebecca saw her mother, Mrs. Kennedy, and she again made the statement that Sherry was being raped. They returned to Boo Boo's Playground, but Sherry was not there.
Rebecca and her mother then went to the bathhouse where they found Sherry. Mrs. Kennedy testified that when they found Sherry she was moaning and groaning and would not answer questions. When asked if they raped her, she shook her head "yes" and held up three fingers.
Mrs. Kennedy then took Sherry to the hospital where she was examined and it was determined that seminal fluid was present. The physician who examined Sherry testified that she had the most traumatized vagina he had ever seen. However, the swelling, he said, resulted from friction, not force or violence. There were no bruises or lacerations on any part of Sherry's body and, three to four hours after the incident, Sherry's blood alcohol level was tested and found to be still .11%, which is over the generally accepted level for intoxication (.10%).
Following the verdict and a judgment against them, the remaining defendants, except Randy Cheramie and his custodial parent, Mrs. Lorraine Cheramie, filed this appeal and presented the following assignments of error:
1. Because enormous psychological damages were at issue, the district court erred in denying an independent psychological evaluation of Sherry Morris after a request was timely made, and in excluding evidence of Drema Morris' prior sexual abuse.
2. Where loss of innocence and virginity was an implied element of damages, the district court erred in denying evidence of prior sexual experience.
3. The quantum of damages is excessive.
The plaintiff answered the appeal and presented one assignment of error:[1]
Answering, plaintiff-appellee avers that the jury's finding that Sherry Morris was contributorily [sic] negligent is in error. In all other respects the findings of fact and law by the trial court are correct and should be affirmed.
Assignment of Error No. 1
The appellant's first issue presented for this court's consideration relates to the trial court's refusal to grant an independent psychiatric examination of Sherry Morris and her mother, Drema Morris, shortly before the trial was to begin. This same issue was presented to this court in a Petition of Supervisory Writs, 87-C-667. The writ was denied on the basis that on the *74 showing made there was no need to exercise our supervisory jurisdiction.
On appeal, appellants argue that their request for a psychiatric examination was made timely and for good cause.
Trial for this matter was set for September 28, 1987. On September 8th, counsel for defendants phoned counsel for plaintiffs to determine if he was amenable to a psychiatric examination of Sherry Morris without the necessity of filing a formal petition. Plaintiff's counsel refused. Therefore, the next day, September 9th., defense counsel phoned the trial court and requested an expedited hearing, which was granted for September 15th. On September 11th, plaintiff's counsel was served with the Petition for Medical Examination requesting that Sherry and Drema Morris be examined on September 16th by Dr. Culver.
The matter was heard by the trial court on September 15, 1987. Defense counsel argued that good cause for a psychiatric examination was shown since the pivotal issues to be tried were the plaintiff's alleged severe and disabling injuries to her mind and the alleged emotional trauma and distress. Defendants also requested that Drema Morris be examined because they alleged that Mrs. Morris' own psychological problems had an effect on her relationship with her daughter and, in turn, on Sherry's behavior and emotional well-being.
Regarding the timeliness of the request, appellants argue that LSA-C.C.P. art. 1464[2] does not state any time limitations. Further, they argued that under Local Rule XVII of the 24th Judicial District Court, where notice is required, and no time is specified by law, seventy-two (72) hours' notice is all that is required.
It is well established that the discovery statutes are to be liberally and broadly construed to achieve their intended objectives. Hodges v. Southern Farm Bureau Cas. Ins. Co., 433 So.2d 125 (La.1983). It is equally well established that the trial court is granted wide discretion in granting physical or mental examinations of parties to the litigation. Taylor v. Treen, 446 So.2d 906 (La.App. 1 Cir.1984); Walker v. Marcev, 427 So.2d 678 (La.App. 4 Cir.1983) writ denied 433 So.2d 182 (La.1983); Vaughn v. Commercial Union Insurance Co. of New York, 263 So.2d 50 (La.App. 4 Cir.1972) writs refused 262 La. 1107, 266 So.2d 425 (1972). Each request must be determined according to its own facts and circumstances. Monroe v. Northwestern National Insurance Company, 210 So.2d 365 (La.App. 3 Cir.1968) writs refused 252 La. 683, 212 So.2d 428 (1968).
In the instant case, the trial court provided the following reasons for denying defendant's motion:
"... this court feels that with respect to the plaintiff child that the psychological stability of this child clearly became an issue as early as, if not sooner than, October 16th, 1986, when this court signed a judgment on a motion requiring a deposition of the plaintiff child, Sherry Morris, and I allowed the psychologist and the mother to be present if necessary because we were going to have to discuss the child. So I find it somewhat strange that it would have taken this long to reasonably anticipate the psychological impact on the child to have requested that [sic] the examination sooner.
I feel that because of the particular facts and circumstances of this case, and because this case has been set for trial now for some time that the actions of the defendants who request this rule dilitory [sic], that they have not pursued this matter with enough diligence with respect to that request and that the plaintiff *75 child should not be penalized for that dilitory [sic] action on behalf of the plaintiff [sic]. This trial has been set for some time now and although I do not see it in the record the trial has clearly been set, so from my feeling at least for three to five months. I would anticipate that I would have set it then, but assuming the fact that it may have been set one time previously and was continued."
The learned trial judge at first consented to the examination of Drema Morris, but subsequently changed his mind and modified his ruling for the following reasons:
"Well, that's what I thought. Well, let me make my ruling consistent. I am trying to accommodate, in my opinion, a last minute effort to discover matters which I clearly believe were apparent and discoverable prior to this rule of [sic] being filed.
I will modify my previous orders. No further depositions will be taken, no further examinations will be conducted on either party because at some point in time the interests of the attorneys and the interests of the clients must be indiversible [sic]. At this point in time I believe we have clearly reached that position.
I've tried to accommodate this disposition. I am trying to work out my schedule, I am trying to make these people available. If the parties to the rule are unable to give me definitive dates in time, then they are not prepared to conduct that. To restate it, no examinations will be conducted, no depositions will be conducted. This matter as far as this Court can conclude, except for emergency proceedings, is ready to go to trial on September 28th."
After considering all of the factors discussed above, especially the delicate nature of the issue involved, the emotional stability of the child, the length of time defendants were aware that plaintiff/child's psychological state would be at issue, the proximity to the trial of the date on which the defendants requested the examination of both Drema and Sherry and the reasons given by the trial judge for denial, we conclude that appellant's arguments are without merit and do not convince us that there was error in the trial court's refusal of this particular request for examination of these two persons.
Assignment of Error No. 2
During her deposition, Rebecca related a confusing and contradictory statement allegedly made to her by Sherry regarding her (Sherry's) previous sexual experiences prior to the incident at issue. A proffer of this evidence was made at trial when the trial court refused to let the jury hear a portion of this statement. Appellants assert that this evidence should have been heard by the jury for the limited purpose of fixing the award. The following is the exact proffer as presented by appellants at trial:
"What I would like to do is offer testimony of Rebecca Kennedy [in which she] stated that Sherry told her that she had gone further than kissing a boy and Sherry said she had sex before and did not say when and then a conversation ensued between them regarding whether or not she was telling the truth to Becky, that she said, yes she is. She talked about it with her and again asked her to retract it and the retraction was never made."
We reviewed Rebecca's entire deposition. At one point therein, Rebecca does, in fact, state that Sherry admitted that she was lying when she stated she had gone further than kissing a boy. Further, Rebecca admitted that Sherry did not tell her exactly how much further she had gone, although there is some vague reference to having "had sex." However, Rebecca's entire deposition was not offered as a proffer, so we may not include it in our considerations; and we find that the proffer, as offered, is inaccurately and poorly phrased, incomplete and vague and would tend to mislead and confuse the jury. We also conclude that these elements of the proffer outweigh its probative value.[3] Consequently, *76 we find no error in the refusal of the learned trial judge to admit the proffered evidence.
Assignment of Error No. 3
Appellants argue that the jury award should be reduced commensurate with the degree Sherry's family and home life, prior and subsequent to the incident at issue, affected her mentally and emotionally. Appellants present arguments pertaining to Sherry's physical injury, her relationship with boys, her behavior problems, educational impairment and her psychological injury and medical expenses.
The jury awarded the plaintiffs a judgment for special damages (psychological treatment of Sherry) in the amount of Sixty Thousand ($60,000) dollars and general damages in the amount of One Hundred Eighty Thousand ($180,000) dollars. The percentages of fault were allocated as follows:

Yogi Bear's Jellystone Park
 Camp Resort 10%
Darren Bouzigard 38%
Wade Galjour 22%
Randy Cheramie 18%
Sherry Morris 12%

The jury made these findings after listening to several days of trial testimony, which included the testimony of several professionals and the family and friends of Sherry Morris. It is well established that when there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review, the appellate court should not disturb this factual finding in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979); Canter v. Koehring Co., 283 So.2d 716 (La.1973).
We have carefully read the testimony, depositions and reports of all witnesses and are of the opinion that after the incident in June, 1984, according to practically all of the existing medical testimony, Sherry experienced obvious emotional and mental distress. Less than one month after the incident, Sherry began counseling with Dr. Jane Hungate, a Doctor of Social Work, who was in her clinical internship at Tulane Medical Center at the time. This counseling covered a period of approximately one year. Dr. Hungate testified that Sherry had an adjustment disorder with mixed emotional features and extreme stress. The testimony of this treating doctor of social work was extensive and very thorough. She stated that "In my professional opinion, at the time I treated Sherry, I felt that her problems were a result from the rape." During the year Dr. Hungate saw Sherry, she ran away from home twice. Dr. Hungate testified that although it is not unusual for a teenager to run away from home at least once, she was of the opinion that Sherry ran away from home when she was afraid of things coming up in her life, specifically a court appearance.
Quite some time after Sherry's visits with Dr. Hungate were terminated, she began seeing Dr. Mary Monger, a clinical psychologist. She originally saw Dr. Monger on an out-patient basis, but Sherry did require in-patient treatment in Northshore Psychiatric Hospital for approximately two months. Dr. Monger was the primary therapist during in-patient treatment and continued to see Sherry on an out-patient basis. Dr. Monger testified that although Sherry's family life may have been an exacerbating factor to Sherry's emotional problems, in her opinion, she attributed a great deal of emotional stress, distress and the cycling pattern that she saw with Sherry to the rape incident of June, 1984.
We note that, indeed, Sherry's family life may have exacerbated the problem to some extent. However, from the record before us, it appears that prior to the incident Sherry co-existed with her family members very well. Although Sherry's family life is not one that we might choose to utilize as an example for all 13-year old children, it was the one into which Sherry was born and reared, and it is well settled that a tortfeasor takes his victim as he finds him.
Dr. William Bloom, a psychiatrist, was Sherry's treating physician while she was a *77 patient at Northshore Psychiatric Hospital. It was also Dr. Bloom's opinion that the symptoms that were observed in Sherry's behavior were related to the rape incident of June, 1984. It was also his opinion that Sherry would have long term problems.
Defendant's witness, Dr. Culver, did not examine Sherry in person at any time (see Assignment of Error No. One). He relied exclusively on reports of others and records for the basis of his conclusions. He testified that he spent only four to five hours reviewing this information, as opposed to the extensive treatment given by the other professionals. Based on his review of the records, Dr. Culver testified as to his conclusions. He stated that Sherry was an emotionally-disturbed child whose problems were evident prior to the incident at issue; in fact, something that goes back quite a long time in her life. In his opinion, the home environment was unstable and all the family members had psychological problems. He also stated, that based on his review of the records, he did not think Sherry suffered from post-traumatic stress syndrome, but that the emotional problems were a result of a culmination of things which occurred over a long period of time. He further stated that, generally, the emotional problems of the adults in a child's life will have a negative influence on that child and this was a possibility in Sherry's case. Additionally, he testified that an overprotective parent tends to instill anxiety in the child.
It is well established that the diagnosis and the opinions of the treating physicians and specialists are entitled to more weight than that of those doctors examining the plaintiff for consultation for litigation purposes only. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (La.1982); Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5 Cir.1984). We find the entirety of the expert medical testimony amply supports the jury's finding for special and general damages. Although we may have found differently, we cannot say that they committed manifest error in fixing these awards.
Additionally, appellants argue that the jury abused its "much discretion" in fixing the award of special and general damages. The well established rule is that an award for damages will not be disturbed on appeal unless an appellate court can give articulable reasons why, on the particular facts of the case before it, the award is an abuse of the trier of fact's "much discretion." Reck v. Stevens, 373 So.2d 498 (La.1979).
We do not find the special damages in the instant case to be excessive. The record is well supported for all past medical bills. To date, more than $33,000 in medical expenses have been incurred by the Morris family. All of Sherry's treating physicians agreed that Sherry will require treatment in the future. According to the physicians, she will require intensive counseling for approximately 18 months and further counseling during the "problem times" of her life. Specifically, Sherry could have problems with relationships with others, particularly during marriage. Therefore, we are of the opinion that the remaining $27,000 is not an excessive amount for the jury to have awarded for Sherry's future medical bills.
Nor can we articulate any reasons why the jury's award for general damages of $180,000 is excessive to the extent that it constitutes a clear abuse of discretion. Sherry was a 13-year old girl at the time of the incident. Since that time, she has experienced problems with her family, has been in out-patient treatment for most of the time since the incident, was hospitalized for nearly two months for in-patient treatment in a psychiatric hospital, and most of her friends and acquaintances at school learned of the incident causing her embarrassment and humiliation. The testimony of the doctors and psychological experts preponderate to the effect that the incident was traumatic and has caused and continues to cause severe emotional and psychological problems for Sherry. The jury has the right to and apparently did believe their testimony, as well as that of Sherry and her witnesses.
We have carefully reviewed the jury's assignment of blame to each party. There is no doubt that each of the parties were at fault to some degree. We take *78 note of the fact that Sherry, although only 13, willingly participated in the original beer drinking, and apparently willingly and voluntarily left her friend to go to a secluded place with a strange boy. This undoubtedly set the stage for the terrible events which followed. However, her age and lack of maturity are mitigating factors. Apparently the jury made similar observations in finding her 12% at fault. Again, although we might have come to different conclusions, we are not so clairvoyant that we can say that the percentages of blame assigned by the jury are clearly wrong, as they seem to be reasonable considering all the circumstances of the case. Therefore, we cannot say that the jury's findings are clearly wrong in this regard.
After a careful review of the jury's total award for all elements of damages and their determination as to the blame or negligence assigned to each party, we find that the awards and percentages of blame are within the jury's discretion and without manifest error. Therefore, this assignment lacks merit.
Accordingly, for the reasons assigned above, the verdict of the jury and the judgment of the trial court are affirmed. All costs of this appeal are to be assessed against the appellants in equal proportions.
AFFIRMED
NOTES
[1] This assignment of error was neither briefed nor argued, thus it is deemed abandoned. Uniform RulesCourt of AppealRule 2-12.4. Moreover, after a careful review of the record, we find this issue without merit.
[2] Art. 1464. Order for physical or mental examination of persons

When the mental or physical condition of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control, except as provided by law. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.
[3] Appellants filed a Motion To Reopen the Record For The Limited Purpose of Corroborating Proffer which was denied by this court and, therefore, was not considered when determining the result of this appeal.