537 So.2d 740 (1988)
Terry WISNER
v.
ILLINOIS CENTRAL GULF RAILROAD, et al.
No. CA 87 1401.
Court of Appeal of Louisiana, First Circuit.
December 20, 1988.
Rehearing Denied February 14, 1989.
Writ Denied March 30, 1989.
*743 Lewis O. Unglesby, William Lowrey, Jr., Baton Rouge, Calvin Fayard, Jr., Easterly and Pittman, Denham Springs, for plaintiff Terry Wisner.
David Kelly and John C. Reynolds, New Orleans, for defendant Illinois Central Gulf R.R.
Peter Dazzio, Baton Rouge, for defendant Elgin, Joliet & Eastern R.R.
Richard J. Brazan, Jr., Baton Rouge, for plaintiff in Intervention Office of Risk Management.
Before COVINGTON, C.J., and LOTTINGER and FOIL, JJ.
LOTTINGER, Judge.
This appeal arises from a jury award of $2,794,000 to the plaintiff, Terry Wisner, who was exposed to toxic chemicals released when an Illinois Central Gulf Railroad (ICG) freight train derailed in Livingston, Louisiana. ICG, the defendant, appeals.

FACTS
On September 28, 1982, an ICG freight train carrying toxic chemicals derailed causing many of the cars to overturn and breach their contents. A major fire also broke out at the site. Wisner, a 35-year-old Louisiana state trooper at the time, was one of the first three troopers to arrive at the scene. He remained at the site to collect placard information from the train, help with evacuation efforts, and secure the area.
Later that morning Wisner complained of a burning sensation in his eyes, nose, and throat. In the weeks following the derailment, Wisner experienced headaches, coughing, and difficulty swallowing, as well as shortness of breath upon physical exertion. At the time of the derailment, Wisner was a desk sergeant and road supervisor. At one time he had also supervised a physical fitness program for the troopers and commanded the Troop A State Police Tactical Team. Lieutenant Ray Farris testified Wisner could run two to three miles at a time. Wisner's symptoms continued, and he voluntarily retired in 1985.

TRIAL COURT
The defendant admitted liability for all compensatory damages that plaintiff could prove were caused by the derailment.
At trial the defendant moved for a mistrial when plaintiff's attorney referred in his opening statement to the conduct of the train's crew that caused the derailment. The trial court denied the defendant's motion and instructed the jury to disregard the statements.
The jury awarded the plaintiff $2,794,000, itemized as follows:

 (1) Past and future physical pain and
 suffering $1,000,000
 (2) Past and future mental pain and suffering $ 600,000
 (3) Past and future medical expense $ 250,000
 (4) Emotional distress $ 600,000
 (5) Loss of earnings and earning capacity $ 344,000

ASSIGNMENTS OF ERROR
The defendant appeals the judgment, assigning the following errors:
1. The trial judge erred in dismissing appellant's motion in limine to exclude evidence of activity of train crew members before, during, and immediately after the derailment.
2. The trial judge erred in refusing to grant appellant's motion for a mistrial when plaintiff's attorney made inflammatory statements during his opening statement.
3. The verdict was manifestly erroneous because plaintiff failed to prove that his severe exercise intolerance was caused by the derailment.
4. The trial judge erred in refusing to give defendant's requested jury charge regarding the burden of proving causation and in charging the jury that plaintiff need only prove by a reasonable possibility of medical evidence that exposure caused plaintiff's injuries.
5. The trial judge erred in refusing to give defendant's requested jury charge regarding the basis of an expert's opinion that a plaintiff has been exposed.
*744 6. The trial judge erred in denying ICG's motion in limine to exclude evidence of or reference to cancer and genetic damage.
7. The trial judge erred in overruling defendant's objection to cancer evidence.
8. The trial judge erred in refusing to charge the jury that an increased risk of cancer is not compensable in Louisiana.
9. The trial judge erred in admitting a prejudicial videotape into evidence.
10. The jury abused its discretion in its award of general damages in this case.
11. The jury's award of $250,000 for past and future medical expenses is excessive and an abuse of the jury's discretion.
12. The jury erred in concluding that plaintiff lost $344,000 in earnings and earning capacity.
13. The trial judge erred in submitting jury interrogatories that allowed for duplicative awards for mental anguish and the jury erred in awarding such duplicative awards.
14. The trial judge erred in refusing to charge the jury that plaintiff was entitled to recover lost wages based on take home or net pay, rather than gross pay.

ASSIGNMENTS OF ERROR NOS. 1 AND 2
Defendant contends the remarks in the opening statement by plaintiff's attorney were inflammatory and should have resulted in a mistrial.
The statements were as follows:
On the morning of September 28, 1982, Terry Wisner, a long-time veteran of the Louisiana State Police, was eating breakfast with his Lieutenant and friend, Dale Moore, at Denny's Restaurant, which is at the Sherwood Forest Exit, and as you know is the jumping off point to come to the Interstate, to go East towards Livingston. At the time that Terry, who was waiting to get off duty, and Dale were eating breakfast and drinking coffee, a lady named Janet Byrd, the girlfriend of the engineer of the Illinois Central Gulf Railroad, was driving a train, carrying thousands of tons of chemicals, right on this road, off of 190, while the driver of the train sat on the side drinking out of a bottle of Old Charter.
Anticipating such references, the defendant filed a motion in limine to prevent plaintiff's attorney from referring to the conduct or actions of the train crew prior to, during, and immediately after the accident. The trial judge dismissed all motions in limine, stating he would rule on the matters as they arose during the trial.
Immediately following the above remarks the trial judge retired the jury and instructed plaintiff's attorney to revise his statement. Upon the jury's return, the judge advised jurors to disregard the remarks because the crew's conduct was irrelevant to the trial.
Defendant argues the remarks made a fair and impartial jury determination impossible and thus the only meaningful remedy was to begin anew with another, untainted jury. We disagree. The cases cited by defendant are distinguishable insofar as they involved extemely prejudicial or confusing comments to the jury. In Boyette v. Auger Timber Company, 403 So.2d 800 (La.App. 2d Cir.), writ denied, 407 So. 2d 731 (La.1981), a case in which the plaintiff was also a third party defendant, the statements were not only prejudicial, but confusing. The plaintiff's attorney in that case argued the defendants were solely at fault. Another attorney, on behalf of plaintiff as the third party defendant, argued the plaintiff was solely at fault. In Morgan v. Liberty Mutual Insurance Company, 323 So.2d 855 (La.App. 4th Cir. 1975), dismissed, 325 So.2d 282 (La.1976), statements made in closing argument likened defendant's negligence to that of a crime and the jurors were told that failure to grant the plaintiff's requested damages would be like pulling "the plug" on plaintiff.
In the case before us there are no such comparable statements. Counsel have *745 great latitude in argument before the jury, subject to regulation and control by the court which must confine argument within proper bounds. See Starks v. Kelly, 435 So.2d 552, 554 (La.App. 1st Cir.1983). Unless the contrary is clearly shown, rulings with regard to allegedly prejudicially improper argument and conduct of counsel are presumed to have been within the trial court's discretion. Luquette v. Bouillion, 184 So.2d 766, 771 (La.App. 3d Cir.1966). Accordingly, in view of the cautionary instruction given the jury and the nature of the statements themselves, we do not find such prejudice as to warrant a mistrial. See Callahan v. Town of Bunkie, 287 So. 2d 629, 635 (La.App. 3d Cir.1973), writ denied, 290 So.2d 905 (La.1974).

ASSIGNMENTS OF ERROR NOS. 3 AND 4
Defendant urges plaintiff failed to prove a causal link between the chemicals released during the derailment and his reported symptoms. Defendant also assigns error to the jury instructions regarding plaintiff's burden of proof.
It is well settled that for a plaintiff to succeed in a tort action, he must prove all elements of his claim (negligence, cause, and injury) by a preponderance of the evidence. Stated another way, he must prove that more probably than not, defendant's actions caused his injury.
The evidence may be either direct or circumstantial. If the evidence is circumstantial, it must, taken as a whole, exclude every other reasonable hypothesis with a fair amount of certainty. But it need not negate all other possible causes. Lacey v. Louisiana Coca-Cola Bottling Company, Ltd., 452 So.2d 162, 164 (La.1984). Furthermore, we realize that medicine is not an exact science. It is not unusual for medical experts to be unwilling to state unequivocally the cause of a certain malady. Likewise, we do not require they do so, but only to provide their considered medical opinion on key issues from which the trier of fact makes its own determinations. See Howell v. Iacona, 505 So.2d 821, 828 (La.App. 2d Cir.1987).
In the case sub judice, the judge instructed the jury: "The test for recovery is whether the plaintiff has shown there is a reasonable possibility from medical testimony that the injuries sustained were triggered by the exposure to the chemicals". (Emphasis added by this court).
This charge is not a precise statement of the law. While it is true that Hull v. North American Van Lines, 343 So.2d 216, 218 (La.App. 1st Cir.1977), and other cases use such language, these cases also cite Peppers v. Toye Brothers Yellow Cab Company, 198 So. 177, 182 (Orl.App., 1940), which conditioned the "reasonable possibility" test for causal relation on also finding that plaintiff was in good health before the accident and that after the accident a dormant pre-existing illness or old injury disconnected with the accident flared up. Thus, two conditions must be met: 1) good health prior to the accident, and 2) medical testimony showing a reasonable possibility that the accident caused the injury.
It is also true that while both Hull and Peppers dealt with a pre-existing injury or illness, other cases not involving a pre-existing illness have applied that precept as well. See Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.App. 2d Cir. 1986); Marcantel v. Allen Parish School Board, 490 So.2d 1162 (La.App. 3d Cir.) writ denied, 496 So.2d 328 (La.1986).
These cases go on to suggest that if these conditions are present, then plaintiff has established a prima facie case and it is then incumbent on defendant to rebut plaintiff's evidence by showing some other particular incident could have caused the injury in question. See Davis, at 1026 and Marcantel, at 1164. Absent rebuttal evidence by defendant, plaintiff has proven his case by a preponderance of the evidence.
To determine if a jury charge is sufficient, all of the charges should be read together as a whole. Page v. Guidry, 506 So.2d 854, 857 (La.App. 1st Cir.1987). Furthermore, if it is determined the jury was instructed correctly then its findings of *746 fact are entitled to great weight and should not be disturbed unless manifestly wrong.
In the case at bar we note the judge explained at the outset that the burden of proof is a preponderance of the evidence and reiterated that standard when he instructed the jury on the standard to be used in evaluation of circumstantial evidence and determining damages. The court again used the proper standard of proof in its instruction that the chemical spill was no basis for inferring that Wisner was in fact exposed to such chemicals. Accordingly, we find that any misconceptions the jury might have had from such terminology as "reasonable possibility" were cured by the other instructions given the jury.
Having determined the jury was properly instructed, we now turn to the record to decide if the record supports the jury's decision. The record reveals the following about Wisner's condition: On stress tests his performance was comparable to that of a 60-year-old cardiac patient. Prior to the accident, Wisner was able to jog two to three miles at a time. Dr. Richard Kearly, Wisner's treating physician who was accepted as an expert in the field of pulmonology, diagnosed Wisner's condition as "reactive air way disease, which is not unlike asthma." Usually after exposure to any number of agents, the lungs of a person with the above disease will become sensitive or spasmodic to any number of irritants encountered at a later date, Dr. Kearly testified, adding that in Wisner's case, his lungs are sensitive to metacholine although he has no history of asthma. Dr. Kearly further stated that Wisner's lungs would not have reacted as they did to the metacholine "had he not had some insult to his lungs." Dr. Kaye Kilburn, accepted as an expert in the fields of internal medicine, pulmonology, cardiology, toxicology, and occupational health medicine, testified that "reactive air way disease" can be induced by toluene diisocyanate (TDI), one of the chemicals on the train.
Dr. Kearly also testified that Wisner was diagnosed by two different physicians as having chemical bronchitis and airway obstruction one month after the train derailment and again eight months after the derailment. He attested to Wisner's cough and stated that tests run by the State Police physician, Dr. Helmut Redetski, reflect obliteration of pulmonary air space, and the biopsy he requested shows pulmonary scars throughout the lungs, as well as fibrosis, which, he said, explains Wisner's decreased diffusion capacity. All of these problems, according to Dr. Kearly, are "consistent" with chemical exposure.
Dr. Richard Reed, a lung pathologist, diagnosed Wisner as having emphysema, fibrous pleuritis, and mild interstitial fibrosis, which Dr. Kearly again stated was secondary to exposure to toxic chemicals. He also stated the cells in Wisner's lungs show an abnormal growth which can be caused by toxic chemical invasion.
Dr. Kearly stated that alveolar capillary function tests done by him and the railroad's doctors all show that between 40 and 50 percent of Wisner's lung capillary function has been destroyed. As a result of the damage to the alveolus, he said Wisner has difficulty transferring oxygen into the lung and carbon dioxide out of it. Once again, he concluded that chemical exposure is the best explanation for Wisner's problems.
Dr. A.C. Dalton echoed Dr. Kearly's findings by saying that Wisner's overly reactive lungs are due probably to the fumes he inhaled at the derailment. Without knowing what specific chemicals had leaked, but based on his knowledge of chemicals in general, Dalton suspected Wisner had been exposed to TDI.
Dr. Woodall Stopford, a Duke University occupational medicine specialist, stated Wisner suffers airway reactivity, secondary to exposure to toxic fumes. He explained that brief high levels of exposure to TDI can produce a marked irritation to airways and damage to the lungs, as well as fibrosis of tissue or direct damage to the lung tissue. He stated that TDI is probably one of the most irritating chemicals that has been tested.
Defendant criticizes the findings of Dr. Kilburn as being unfounded and also notes *747 that Kilburn could not explain the cause of Wisner's exercise tolerance. However, we note that while Dr. Kilburn had no explanation, he later admitted he had overlooked the metacholine test conducted by Dr. Dalton and to which Wisner responded abnormally. He opined that Wisner's hypersensitive condition"reactive airways disease"triggered by such chemicals in the environment as metacholine, explains the discrepancy between Wisner's one-time normal performance and the other times when it was abnormal. He theorized that the chemicals in Wisner's body interacted or polymerized with the chemicals released during the derailment to create his supersensitivity to various elements in the air. Kilburn explained there is no body of scientific literature to support his theory because most studies are based on exposure to one chemical at a time and not to a variety of toxic chemicals at the same time.
In contradiction of the above findings, Dr. James Morris, accepted as an expert in the fields of internal medicine and cardiology and who saw Wisner at Duke University, testified he did not think the exercise intolerance was due to a pulmonary disease. Nor did he suspect heart trouble or a neurological disorder. Rather, he surmised that Wisner's poor performance on the exercise tolerance tests were compatible with "severe deconditioning." On the tests, Wisner's performance was comparable to that of a 60-year-old cardiac patient. He acknowledged there are findings of mild restrictive lung disease and a mild diffusion defect, but no evidence of pulmonary limitation to activity. Dr. Morris concluded that Wisner was suggestible and that his § exercise intolerance was due to a "superimposed functional impairment of activity, possibly resulting from the psyche trauma of the accident."
Defendant cites Thompson v. Southern Pacific Transportation Co., 809 F.2d 1167 (5th Cir.), cert. denied, ___ U.S. ___, 108 S.Ct. 76, 98 L.Ed.2d 38 (1987) and Sterling v. Velsicol Chemical Corporation, 855 F.2d 1188 (6th Cir.1988), where the plaintiffs failed to prove that chemical exposure caused their injuries.
Thompson is distinguishable insofar as only one expert, a toxicologist, linked the chemical exposure to plaintiff's problems. He had no knowledge of the amount or duration of the exposure, whereas another toxicologist unequivocally stated that plaintiff did not receive enough exposure to cause his ailment. Moreover, he stated his symptoms were not consistent with such exposure. In addition, three of the five physicians who testified attributed plaintiff's problems to his alcohol consumption, and two others had no opinion as to causation. In the case sub judice, most of plaintiff's witnesses linked his exposure to his symptoms inasmuch as his symptoms were consistent with such exposure. Although defendant attempted to show Wisner's condition could be attributed to some other factor, such as his eight-year consumption of Didrex, an amphetamine, plaintiff's treating physician Dr. Kearly, minimized that connection. He said while it "is possible" Didrex can cause headaches, tiredness, vomiting, depression, high heart rate, and dizziness, he emphasized that Wisner was on a "relatively low dose" and thus he doubted the Didrex was responsible.
Likewise, Sterling is distinguishable insofar as the experts who testified in that case used words such as "possibly," "may have," "might have", or "could have", whereas in this case, the experts said Wisner's symptoms were "consistent" with chemical exposure or chemical exposure was the best explanation for his problem.
Thus after a thorough review of the record with emphasis on the above-cited testimony and plaintiff's relatively good health prior to the derailment, we find plaintiff presented a prima facie case which defendant failed to rebut with an adequate, alternative explanation of what caused Wisner's problems. Accordingly, the jury did not commit manifest error when it found that plaintiff's injuries were caused by his exposure to the chemicals released following the derailment.

ASSIGNMENT OF ERROR NO. 5
Defendant next complains the trial court erred in refusing to give the following *748 jury charge regarding the testimony of experts:
An expert's opinion that a particular plaintiff was exposed to toxic chemicals and that exposure caused injury must be supported by knowledge about the amount or duration of the exposure. In the absence of such knowledge, there is an insufficient basis for the opinion and it therefore should be rejected.
This charge is apparently derived from language used in Thompson, 809 F.2d 1167. As we stated previously, the lack of knowledge regarding the amount of exposure was not the determining factor in Thompson. Rather it was the preponderance of evidence offered by defendant's experts indicating that alcohol consumption was more likely the cause of plaintiff's affliction.
In the instant case, no readings measuring the amount of chemicals released into the air were taken. Consequently, plaintiff was forced to rely on circumstantial evidence, and the judge thus instructed the jury that a plaintiff, relying on circumstantial evidence, must present "evidence which excludes with a fair amount of certainty every other reasonable hypothesis ... When a medical opinion is formed exclusively, or in significant part from the patient's statements or subjective symptoms, the jury must take into account the plaintiff's credibility in deciding the weight to be given the medical opinion."
While it is true under former jurisprudence that an expert's testimony must be based on "facts in evidence", this case is distinguishable from Keener v. Fidelity and Casualty Company of New York, 96 So.2d 509, 514-515 (La.App. 2d Cir.1957), the case which enunciated that rule. In Keener, the doctor based his testimony on a hospital record that had not been admitted into evidence.
In this case our opinion would be different if chemical readings had been taken but excluded from the record. Accordingly, where there are no facts, such as the exact degree of Wisner's exposure, we hold the experts are still entitled to offer their conclusions based on their areas of expertise, the circumstantial evidence, i.e. Wisner's health before and after the accident, and the medical tests given Wisner.
The jury is then entitled to attach such weight as it finds the expert testimony deserves. See Walker v. Marcev, 427 So. 2d 678, 685 (La.App. 4th Cir.), writ denied, 433 So.2d 182 (La.1983).
Therefore, for the foregoing reasons, we find no merit to this assignment of error.

ASSIGNMENTS OF ERROR NOS. 6, 7, AND 8
Defendant complains that the trial court erred in denying appellant's motion in limine to exclude evidence or reference to cancer and genetic damage, in allowing testimony of increased risk of cancer, and in refusing to give defendant's requested jury charge number nineteen. It is undisputed that the plaintiff did not have cancer. Further, although there is testimony of an increased risk of cancer, there is no testimony which indicates that the plaintiff is more likely than not to get cancer. Nevertheless, the testimony of the plaintiff, Terry Wisner, and his psychiatrist, Dr. Louis Cenac, does indicate that Terry Wisner has a justified fear of acquiring cancer.
Louisiana law is clear that a person can recover for a justified fear that he may acquire cancer. Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974). Therefore, all evidence having any tendency to show a justified fear of acquiring cancer is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. State v. Ludwig, 423 So.2d 1073 (La.1982). In this case, the evidence showing an increased risk of cancer tends to show the plaintiff is reasonable in his fear of acquiring cancer. Because the fear is reasonable, it is more likely that the plaintiff is telling the truth about his fear. Thus, the evidence of the increased risk of cancer is relevant to the issue of whether the plaintiff was suffering a genuine and justified fear of cancer.
*749 This evidence is therefore admissible unless its probative value is substantially outweighed by the prejudicial effect. The trial judge's decision on relevance should not be reversed unless a clear misuse of discretion has occurred. State v. Kahey, 436 So.2d 475 (La.1983). State v. Kimble, 407 So.2d 693 (La.1981); State v. Miles, 402 So.2d 644 (La.1981). This clear error test is equally applicable to the trial court's determination as to prejudicial effect. Applying the above precepts to this case, this court can find no abuse of discretion by the trial court in allowing the testimony on Terry Wisner's increased risk of cancer or in denying the defendant's motion in limine.
The defendant further complains that the prejudicial effect of allowing the testimony could have been reduced by the following jury instruction: "Louisiana law does not allow recovery for an increased risk of cancer. Should plaintiff contract cancer at a later date he will be able to recover at that time if he can prove that cancer was caused by the defendant's conduct."
The trial court must give all requested instructions which are material and relevant to the litigation. The judge need not use the exact language submitted by the party, but the instruction must adequately reflect the law on the issues presented. A judge does not have to give requested special charges where they were included in the general charges. Lincecum v. Missouri Pacific Railroad Co., 452 So.2d 1182 (La.App. 1st Cir.), writ denied, 458 So.2d 476 (La.1984).
The instruction given by the trial court is as follows: "[l]ike other parts of the plaintiff's case, these damages must be established by a preponderance of the evidence. This means, on the one hand, that you're not entitled to award speculative damages for injuries which you think the plaintiff might have suffered, or might suffer in the future." (emphasis added).
This court is of the opinion the instruction given by the trial court adequately reflects the law. However, even were this court to conclude the defendant's instruction should have been given, we do not believe the error would justify a trial de novo or a change in the verdict. The standard of appellate review is that the mere discovery of an error in the trial judge's instructions does not itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances as a whole. Simmons v. Hope Contractors, Inc., 517 So.2d 333, 337 (La. App. 1st Cir.1987), writ denied, 518 So.2d 510 (La.1988).

ASSIGNMENT OF ERROR NO. 9
The defendant next assigns error to the admission of a video tape, plaintiff's exhibit number six, because it depicts dead animals around the scene of the accident. ICG argues that the probative value of the film is outweighed by the prejudicial effect.
The film reflects the morning of the train derailment and events thereafter. It shows the position of the number of cars and gives an overall view of the area of Livingston in which Wisner was placed. This evidence is therefore relevant and admissible unless its probative value is substantially outweighed by the prejudicial effect. The defendant complains that the depiction of a dead possum near the derailment site makes the film so prejudicial that it should be excluded. This film was not prepared by the plaintiff in anticipation of litigation. The film shot of the possum was for approximately thirty seconds on a twenty minute film. The film as a whole is highly probative and an accurate depiction of the accident scene and smoke being emitted by the wreck. There is some prejudicial effect in that the jury might conclude that the chemicals caused the possum's death and that eventually Wisner will die from the same thing. This court cannot say, however, that the prejudicial effect substantially outweighs the probative value, and for that reason the trial court did not err in allowing its admission.

ASSIGNMENT OF ERROR NO. 10
Defendant objects to the jury's award of $2,200,000 in general damages which includes $1,000,000 for past and future *750 physical pain and suffering, $600,000 for past and future mental pain and suffering, and $600,000 for emotional distress.
It is well settled that the amount awarded at trial will not be altered on appeal absent an abuse of discretion by the judge or jury.
Prior awards have a limited role. Before a trial court's award may be questioned, the reviewing court must look first, not to prior awards, but to the individual circumstances of the case before it. If, after such review and an articulated analysis of facts, the reviewing court concludes the award is excessive, notwithstanding the jury's "much discretion", the court may resort to prior awards in cases with facts and circumstances closely similar to the case before the court. However, such reliance should not be selective, but rather should be based on the "mass" of prior awards involving truly similar injuries. Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
Stated another way, "[i]t is not the function of the appellate courts, including the Supreme Court, to standardize general damage awards across the state in cases with similar facts. Our purpose and our constitutional role is to guarantee by appellate review that the trial judge or jury in fulfilling its role has not so excessively abused its much discretion that our consciences would be shocked if such an award were allowed to remain untouched." Hanzy v. Sam, 385 So.2d 355, 358 (La.App. 1st Cir.), writ denied, 386 So.2d 357 (La.1980).
A careful review of the record reveals the following about Wisner's condition:
In addition to Wisner's lung condition and exercise intolerance, which have been discussed earlier in this opinion, Wisner also suffers from severe depression, impotence, and loss of vision. His psychiatrist, Dr. Cenac, testified that Wisner's depression stems from the abrupt change in his lifestyle from being active to passive. Dr. Woodrow Facundus, a urologist treating Wisner for his impotence, stated that Wisner has dramatically lowered serum testosterone levels and reduced blood flow to the genital area. To counteract his impotence he must inject his penis with large doses of papaverine, and that eventually he will develop an immunity to the drug. Dr. Facundus stated Wisner's testicles and pituitary gland were damaged by the chemicals released at the derailment. Although a penile implant will allow him to have an erection, it will not produce an orgasm or create any pleasurable sensations.
Dr. William Williamson, an opthomologist who first saw Wisner as a patient in 1986, testified that Wisner's optic nerve looked palea condition indicative of nerve degeneration. He said Wisner had convergence insufficiency (double vision) and decreased peripheral vision. Dr. Williamson believes the 1982 chemical exposure is the cause of his problems.
Accordingly, in view of the above findings, we cannot say the "entire" general damage award of $2,200,000 is so excessive that "our consciences would be shocked" to allow such an award to remain untouched. Hanzy, at 358. See also Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3d Cir. 1987), writs denied, 522 So.2d 562, 563 (La.1988).

ASSIGNMENT OF ERROR NO. 11
The defendant assigns error to the jury award for past and future medical expenses. We must determine whether the trier of fact abused its much discretion in awarding damages. La.Civ.Code art. 1999 and 1934(3) (1870). The jury awarded $250,000 for past and future medical expenses. The highest dollar amounts mentioned for any conceivable procedures that the experts testified could be performed to help Terry Wisner are as follows. The past medical expenses totaled $36,000. The testimony indicates that future exercise rehabilitation sessions could cost $50,700; cardiopulmonary tests could cost $27,000; and psychiatric treatment could cost $52,000. There is testimony that Mr. Wisner will need Papaverine injections to increase his potency at a cost of $11,700. There is also testimony that once the drug is no longer effective a penile implant at a cost of $20,000 could be used to furnish an erection. The above figures total $197,400. There is no evidence in the record sufficient. *751 to support an award higher than this total. Therefore, the trier of fact abused its much discretion, and the award for past and future medical payment is reduced to $197,400.

ASSIGNMENT OF ERROR NO. 12
Defendant complains of the $344,000 awarded in loss of earnings and earnings capacity. He states that it was not proven that Mr. Wisner could no longer do his job with the State Police. Awards for loss of future income are inherently speculative and insusceptible of being calculated with mathematical certainty. The court must exercise sound judicial discretion in reviewing these awards and render a decision which is consistent with the record and does not work an injustice on either party. Smith v. Porche Brothers Lumber and Supply, Inc., 491 So.2d 412 (La.App. 1st Cir.1986). The standard to be applied requires damages for loss of earnings to be based on the injured person's ability to earn money rather than what he actually earned prior to the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of future income awards thus encompasses the loss of a plaintiff's earning potential. Loss of earning potential is the loss or reduction of his capability to do that for which he is equipped by nature, training, and experience and for which he may receive recompense.
Terry Wisner, because of his exercise intolerance, is unable to do any work requiring strenuous activity. Police officers need to be in good physical condition to keep from being a danger to their partners and society alike. Further, Dr. Williams testified that Mr. Wisner has difficulty reading because of his convergence insufficiency. Dr. Gorman, a board certified psychotherapist, who counseled Terry Wisner after the derailment, stated that unless there is a radical change in Wisner's health condition, he probably could not get him a job. Based on this testimony it appears that the jury was reasonable in concluding that Terry Wisner has lost a great deal of his capacity to earn a living. Dr. Rice testified that Terry Wisner lost $56,208 in past wages and $697,486 in future wages, awarded $344,000. Thus, it is apparent that the jury did not abuse its much discretion. La.Civ.Code Art. 1999.

ASSIGNMENT OF ERROR NO. 13
The defendant next assigns error to the submission of jury interrogatories which included separate categories for "past and future mental anguish" and "emotional distress." The jury awarded $600,000 for "past and future mental anguish" and an additional $600,000 for "emotional distress." Defendant complains that these two items are the same and that the awards are therefore duplicative.
The defendant cannot now complain of the form of the jury interrogatories unless he objected to them at trial either before or after their submission to the jury. His submission of alternative interrogatories does not constitute an objection. The objection must be specific and allow the trial judge an opportunity to correct the error. The submission of alternative interrogatories does not by itself alert the trial judge that the interrogatories of the other party are in error. The defendant must object to the specific interrogatory he considers duplicative. Bourque v. Gulf Marine Transportation Inc., 480 So.2d 337 (La.App. 3d Cir.1985); Walker v. Department of Transportation and Development, Office of Highways, 460 So.2d 1132 (La.App. 2d Cir.1984), writ denied, 464 So.2d 1377 (La. 1985); Nailor v. International Harvester Company, 430 So.2d 784 (La.App. 5th Cir.), writ denied, 437 So.2d 1148, 1149 (La. 1983).
Therefore, we find no error.

ASSIGNMENT OF ERROR NO. 14
Additionally the defendant assigns error to the trial judge's refusal to give a jury instruction that loss of future wages should be computed on an after-tax basis ("take home pay"). The trial judge's refusal was proper. For the reasons set forth in Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370 (La.App. 1st Cir.), *752 writ denied 305 So.2d 123 (La.1974), and its progeny, we will continue to use pre-tax earnings to calculate loss of future earnings.
Therefore, for the above and foregoing reasons the judgment of the trial court insofar as it awarded $250,000 for past and future medical expenses is reduced to $197,400, and in all other respects is affirmed.
AMENDED AND AFFIRMED.