635 So.2d 325 (1994)
Lloyd Glen SMITH
v.
The DOW CHEMICAL COMPANY.
No. CA 92 0883.
Court of Appeal of Louisiana, First Circuit.
March 28, 1994.
*327 Lewis O. Unglesby, Baton Rouge, for plaintiff-appellee Lloyd Glen Smith.
Daniel Balhoff, Carey J. Guglielmo, Baton Rouge, Karen Dugas, Plaquemine, Frank A. Fertitta, Baton Rouge, John L. Delahaye, Plaquemine, for defendant-appellant The Dow Chemical Co.
Before WATKINS, CRAIN and GONZALES, JJ.
GONZALES, Judge.
Lloyd Glen Smith, a Dow Chemical Company employee from 1974 to 1988, filed suit against Dow, and a number of Dow employees and supervisors,[1] in 1989 alleging injury from exposure to vinyl chloride and other chemicals during the time period that he worked on the loading docks at Dow (1970 to 1974). Dow agreed to assume liability and responsibility for any damages for which its employees were found liable in the course and scope of their employment with Dow or as executive officers of Dow. In exchange for Dow's assuming liability for its named officers and employees, those named employees and officers were dismissed from the suit.
After trial on the merits, the court ruled in favor of Mr. Smith, finding that he was exposed to levels of vinyl chloride which caused his mental deterioration and lung problems (organic brain disfunction and small airways disease), and awarded two million dollars in general damages "representing physical and mental pain and suffering and fear of contracting cancer." In addition, Mr. Smith was awarded $496,036 for lost wages and $41,832 for future medical expenses. The court did not rule on Dow's peremptory exception raising the objection of prescription; therefore it is deemed denied. Gautro v. Fidelity Fire and Casualty Insurance, 623 So.2d 106, 107 n. 1 (La.App. 1st Cir.1993). Dow filed a suspensive appeal from that judgment.
Dow makes the following assignments of error:
1. The trial court erred in not holding that plaintiff's exclusive remedy against Dow was in worker's compensation.
2. The trial court erred in holding that absolute liability is a valid exception to worker's compensation, as an exclusive remedy.
3. The trial court erred in holding that plaintiff produced sufficient evidence to establish the elements of absolute liability.
4. The trial court erred in holding that plaintiff produced sufficient evidence to establish the elements of intentional tort.
5. The trial court erred in holding that the plaintiff produced sufficient evidence to establish the elements of negligence against Dow or any of its employees.
6. The trial court erred in defining defendants' duty to plaintiff.
7. The trial court erred in finding that there was sufficient evidence to establish a breach of duty.
8. The trial court erred in finding that plaintiff's damages were caused by defendants' breach of duty.
9. The trial court erred in defining the scope of defendants' duty, and finding that *328 plaintiff's injuries fell within the scope of defendants' duty.
10. The trial court's award of $2 million in general damages was an abuse of discretion.
11. The trial court erred in concluding that plaintiff lost $496,036 in earning capacity.
12. The plaintiff's fear of cancer and small airways obstruction claims have prescribed.
13. The defendants' motion to recuse and for mistrial should have been granted.

ANALYSIS
Because we find that the trial court's ruling was legally erroneous and factually manifestly erroneous, we need not address each assignment of error separately. The trial court found, in its reasons for judgment:
Clearly Dow knew Vinyl Chloride was hazardous. Dow's studies in 1973 and 1974 prove their knowledge. Dow's records prove their knowledge of Vinyl Chloride exposure was conveyed to the safety director in Plaquemine. Doctor Currier testified that from the 1960's on, Dow knew exposure could cause illness.
. . . . .
The Court is satisfied that Smith's employers and supervisors knew the exposure limits, required plaintiff to work under conditions guaranteed to exceed those limits and deliberately and negligently failed to take any action to protect the plaintiff. It was clearly proven that harm from exposure was a known foreseeable risk. Under these circumstances Dow is liable and damages are justified.
Although the trial court uses the term "Dow" loosely in its written reasons, the court hinges liability upon negligence by Dow's employees and supervisors. Dow can only be liable as an indemnitor for its employees, not as a tortfeasor, because Mr. Smith's only remedy against his employer is in worker's compensation. La.R.S. 23:1032. Because Dow is in the suit in the position of an indemnitor, and not in the position of tortfeasor, the only relevant knowledge in this case is that of Dow's named officers and employees in the suit, and this case must be evaluated as an executive officer's suit against the named employees and officers.
The trial court found Dow's employees and supervisors were negligent under the law in effect at the time of Mr. Smith's chemical exposure, which was from 1970 to 1974. The law governing personal liability for employees and supervisors which was in effect at that time is set out in Canter v. Koehring Company, 283 So.2d 716, 721 (La.1973), which provides the following four-part test:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or should know of its non-performance *329 or mal-performance and has nevertheless failed to cure the risk of harm. (Emphasis added.)
We find that the trial court committed legal error in finding that part three of this test was met. The trial court found in its reasons for judgment that "[i]t was clearly proven that harm from exposure was a known foreseeable risk." (Emphasis added). The injuries the trial court found that Mr. Smith suffered from (other than fear of cancer, which will be addressed separately) were mental deterioration and lung problems (referred to as organic brain disfunction and small airways disease by Mr. Smith's physician). This court has thoroughly and carefully reviewed the entire record and finds no evidence whatsoever that small airways disease and/or organic brain disfunction were foreseeable risks from exposure to vinyl chloride known to Dow supervisors and employees during the 1970 to 1974 time period. As this court stated in Johnson v. Schneider, 271 So.2d 579, 586 (La.App. 1st Cir.1972), which case is cited with approval in Canter v. Koehring:
Within the scope of the undertaken duty, the agent must exercise ordinary care commensurate therewith under the circumstances. Failure to exercise such care, whether from malfeasance, misfeasance or nonfeasance, renders the agent liable in tort to the third party for those injuries which are the reasonably foreseeable results thereof. Stated otherwise, the agent is responsible when he either saw or should have seen that his negligent performance or failure to perform his duties would cause the kind of damage which ensued to the class of persons in which the injured party is included. (Emphasis added.)
Because the trial judge did not provide us with findings of fact on the issues of what illnesses which Dow employees and supervisors were aware could be caused by exposure to vinyl chloride, nor at what level of exposure these illnesses were caused, it is difficult to assess the type and extent of knowledge he attributed to these persons. Dr. Mortimer F. Currier, who was a physician at Dow during the 1970 to 1974 time period and later became the company's medical director, is the only individual defendant named in the trial court's reasons for judgment.[2] The only harm known to Dr. Currier from exposure to vinyl chloride at the time of Mr. Smith's exposure was acro-osteolysis, a rare form of arthritis which studies at that time found only in a low percentage of kettle workers in the poly vinyl chloride (PVC) industry (not the methyl vinyl chloride the plaintiff claims he was exposed to), and angiosarcoma of the liver, again found in PVC kettle workers. Dr. Currier testified as follows:
Q. Let me ask you just to focus in on that for just a moment. That had been reported as an effect of exposure to some chemical?
A. Acro-osteolysis has been found in PVC workers only; it has never been reported in vinyl chloride monomer workers. And it had been reported in the people who work in the kettles in the PVC industry and just a certain low percentage of them.
Q. And so that would have been the reason for wanting to check out
A. Yes, that's right; and that was the first report that came out before even they knew that there would be angiosarcomas of the liver, it had been reported in the 60's by thatof course, only in the kettle workers. (Emphasis added).
Dr. Currier also testified in pertinent part:
Well, first of all, acro-osteolysis has only been reported in people who work with high exposures, most people figure three hundred, [parts per million] plus over a long period of time and it's only been reported in any literature, I can give you references, in the workers who work in the kettles. Workers who go in and actually clean out the polymers where they use *330 chisels and so forth and become exposed to high amounts.
On cross-examination Dr. Currier testified as follows:
Q. In your knowledge of communications and formal meetings have you ever been aware of any diagnosed cases of vinyl chloride disease within the Dow Chemical Company?
A. No.
Q. Have you ever personally seen any vinyl chloride disease?
A. No.
Q. And is vinyl chloride disease the same as this acro-osteolysis.
A. That's part of the disease; acro-osteolysis is clearer than those.
Q. Does the angiosarcoma come in to the vinyl chloride disease?
A. No, that would be different.
Q. That's different. Has there ever been any knowledge on your part as an employee of Dow or either as the chief medical officer of the Louisiana Division, that there have been cases of exposure or such to make someone be diagnosed here with a
A. Angiosarcoma?
Q. vinyl chloride disease or angiosarcoma?
A. No; no.
Q. Are you aware of any practices from you've been working here since 1957, at least on a part-time basis, of exposure in quantities sufficient to give rise to these sorts of diseases?
A. No, I'm not aware of that.
Q. In fact, are you aware of whether there has been any reported case of vinyl chloride disease from someone who worked with monomer vinyl chloride?
Q. No, I'm not aware of that.
Dr. Currier further testified in regard to angiosarcoma:
Q. Are you aware of the frequency with which liver angiosarcoma has been discovered in vinyl chloride monomer workers?
A. Well, this report is primarily about the PVC. I think there are about, from the last I saw it if my numbers are right, I think there have been three methylene workers who have developed angiosarcoma over the whole world.
Q. Over the world?
A. Yes, and all together, I think a hundred and thirty-eight people worked with vinyl chloride, a hundred and thirty-eight over the whole world who have gotten angiosarcoma.
Q. The majority of those are PVC workers?
A. Oh, a large majority, you know, three from one hundred and thirty-eight, one hundred and thirty-five.
Q. PVC being Poly Vinyl Chloride?
A. Poly Vinyl Chloride.
Q. As opposed to methylene vinyl chloride, which was produced at the Dow Louisiana Division?
A. Yes.
Aside from Dr. Currier's knowledge of the slight risk of liver disease and arthritis from extremely high exposure to poly vinyl chloride, as opposed to methylene vinyl chloride, which was manufactured by Dow in Louisiana, there is no evidence in the record that any other Dow employee or supervisor was aware of the risks associated with overexposure to vinyl chloride. There is evidence that some of the Dow supervisors could smell vinyl chloride while working on the docks, indicating an exposure level above OSHA limits and Dow's own internal standard. However, that knowledge is separate from the knowledge of Dr. Currier that extremely high exposure to poly vinyl chloride could cause liver disease and a rare form of arthritis in kettle workers (an extremely different job than the job of the plaintiff). From the knowledge that Dr. Currier had with reference to poly vinyl chloride there would be no negligence by nonfeasance on his part in not imparting that knowledge to supervisors working with methylene vinyl chloride.
The trial court committed legal error in combining the separate knowledge of these individual defendants and lumping it together to find in its reasons for judgment:
Doctor Currier testified that from the 1960's on, Dow knew exposure could cause illness.

*331 The Court is satisfied that Smith's employers and supervisors knew the exposure limits, required plaintiff to work under conditions guaranteed to exceed those limits and deliberately and negligently failed to take any action to protect the plaintiff. It was clearly proven that harm from exposure was a known foreseeable risk. Under these circumstances Dow is liable and the damages are justifiable.
The trial court failed to find that both the knowledge of over exposure and the knowledge of the possible risks of over exposure were found in any one named defendant. Even if we were to combine the knowledge of exposure to methyl vinyl chloride on the docks which exceeded OSHA limits with knowledge of studies that long-term excessive exposure to poly vinyl chloride by kettle workers had been linked with a very small percentage of acro-osteolysis and liver disease, that combination does not equate to knowledge that Mr. Smith was being exposed to sufficient levels of methyl vinyl chloride to expose him to the risk of harm in the form of the maladies from which he now suffers, organic brain disfunction and small airways disease, nor could it be said that an individual with knowledge of that exposure and those risks under those circumstances should have surmised such. It was legal error for the trial court to attribute to some collective corporate mind the knowledge of the individual defendants. The knowledge of Dr. Currier that another type of chemical (PVC) could cause some injury to a certain class of workers (kettle workers) does not impose on him the duty to warn dock workers of a hazard unrelated to them and different from the chemical they are working with. To make such a warning would be irresponsible, and cause unnecessary alarm.
The trial court's finding that "[t]he Court is satisfied that Smith's employers and supervisors knew the exposure limits, required plaintiff to work under conditions guaranteed to exceed those limits and deliberately and negligently failed to take any action to protect the plaintiff" is not borne out by the record. In fact, the record shows that Dow consistently took measures to protect the health of its employees, beyond those measures required by OSHA. For example, at the time Mr. Smith was working at the docks (1970 to 1974), and thus had the potential for exposure to vinyl chloride, the Department of Occupational Safety and Health Administration (OSHA) regulations limited exposure to 500 parts per million. Dow's internal exposure limits were ten times more strenuous, limiting exposure to 50 parts per million. Dr. Currier testified that all employees were given yearly examinations, including blood tests, and that those employees (including Mr. Smith), who had potential exposure to vinyl chloride, were given yearly screenings to monitor any changes in liver enzymes because of the known possible risks of liver disease to poly vinyl chloride kettle workers. In addition, because of the reports of acro-osteolysis in a small percentage of kettle workers, X-rays were made of the hands of these employees to screen for the development of this rare form of arthritis. We find that the trial court committed legal error and manifest factual error in its reasoning, and for that reason we must reverse the trial court judgment in its entirety.

THE LOST EARNING CAPACITY AWARD
We feel compelled to point out that, even were the damage award not reversed in toto, the awarding of damages for lost earning capacity would be erroneous because plaintiff had been on permanent disability from Dow since 1988 because of rheumatoid arthritis. Among the factors to be considered in determining an award of lost earnings are plaintiff's physical condition prior to the accident, his past work record as to consistent employment and amount of earnings, and the probability he would have continued to earn wages over the remainder of his working life as he had in the past had he not sustained the injury. Wallace v. Slidell Memorial Hospital, 509 So.2d 69 (La.App. 1st Cir.1987); see also O'Liphant v. Fitzgerald Brothers Lumber Co., 265 So.2d 266 (La. App. 3d Cir.1972). Because Mr. Smith was totally disabled by arthritis in 1988, he has not shown that he would have continued to earn wages over the remainder of his working life if he had not been exposed to vinyl chloride. Therefore, the award of lost wages *332 would have to be reduced to zero were the damage award not already reversed in its entirety.

THE CAUSE OF ACTION FOR FEAR OF CANCER
We also feel compelled to point out that, even were the damage award not reversed in toto, the fear of cancer award would also have to be reversed because it is clearly prescribed. Mr. Smith testified on direct examination as follows:
Q. Have you learned that thethe various chemicals that you were exposed to, that you worked with on the docks, can cause cancer in people?
A. Right. I knew back in the early `70s. I was aware of the different reports that were coming out about it and a lot of it was Dow generated material that, you know, they were running surveys where they had brain tumors and Freeport, Texasyou know, the Dow plant there had run some studies and the vinyl I was aware that when theyyou know, the big vinyl scare around '74, '75, you know that vinyl caused cancer. So, it there was a problem. (Emphasis added.)
According to Mr. Smith's own testimony, he was aware of reports that vinyl chloride caused cancer at least by 1975. This suit was filed in 1989. His claim for damages for fear of cancer has clearly prescribed because at least fourteen years have passed since that cause of action arose. In that regard, Mr. Smith relies upon the theory of contra non valentem arguing in brief that "[p]laintiff could not bring a fear of cancer claim absent some evidence that his fear was `reasonable.' In this case, plaintiff introduced evidence to show that this fear was completely reasonable, but that information was not available to plaintiff more than one year prior to the filing of suit." Contra non valentem is a jurisprudentially created exception to Civil Code article 3467 which states that "[p]rescription runs against all persons unless exception is established by legislation." See Corsey v. Louisiana Department of Corrections, 375 So.2d 1319 (La.1979). The Louisiana Supreme Court has recognized four categories of situations in which the doctrine of contra non valentem can be applied: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and, (4) (the situation Mr. Smith seeks to avail himself of) where the cause of action is not known or reasonably knowable by the plaintiff even though his ignorance is not induced by the defendant. Matherne v. State Farm Mutual Automobile Insurance Company, 599 So.2d 816, 818 (La.App. 1st Cir.) writ denied, 600 So.2d 648 (La.1992); Plaquemines Parish Commission Council v. Delta Development Company, 502 So.2d 1034 (La.1987); Gover v. Bridges, 497 So.2d 1364 (La.1986). This fourth principle will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned. Corsey, 375 So.2d at 1321. Mr. Smith testified that he began to fear cancer in the early 1970's. He failed to identify any information regarding the reasonableness of his fear that was not available to him until a year before he brought suit. Mr. Smith cites as authority for his contra non valentem argument Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740 (La. App. 1st Cir.1988), writ denied, 540 So.2d 342 (1989). In Wisner, the court stated:
It is undisputed that the plaintiff did not have cancer. Further, although there is testimony of an increased risk of cancer, there is no testimony which indicates that the plaintiff is more likely than not to get cancer. Nevertheless, the testimony of the plaintiff, Terry Wisner, and his psychiatrist, Dr. Louis Cenac, does indicate that Terry Wisner has a justified fear of acquiring cancer.
[I]n this case, the evidence showing an increased risk of cancer tends to show the plaintiff is reasonable in his fear of acquiring cancer. Because the fear is reasonable, it is more likely that the plaintiff is *333 telling the truth about his fear. Thus, the evidence of the increased risk of cancer is relevant to the issue of whether the plaintiff was suffering a genuine and justified fear of cancer.
537 So.2d at 748. Although the Wisner Court found that the testimony of Wisner's increased risk of cancer tended to show the reasonableness of plaintiff's fear of contracting cancer, it does not follow that Mr. Smith had no cause of action for his fear of cancer until Dr. Kliburn linked his small airways disease and organic brain disfunction to his vinyl chloride exposure. No one may avail himself of ignorance of the law. La.C.C. art. 5. A tort which gives rise to mental anguish or emotional upset on the part of the injured party creates a claim for damages which is separate and distinct from any claim for physical pain and suffering. Harris v. Pineset, 499 So.2d 499, 506 (La.App. 2nd Cir. 1986), writs denied 502 So.2d 114, 117 (La. 1987); Trahan v. Perkins, 197 So.2d 96, 99 (La.App. 1st Cir.1967). Dr. Kliburn did not tell Mr. Smith anything he did not already know about his fear of cancer. Dr. Kliburn simply agreed with Mr. Smith that the fear was reasonable, thus providing him with an expert witness to testify that his fear was reasonable. Contra non valentem does not operate to prevent the running of prescription until such time as a plaintiff can find witnesses to prove his case. Mr. Smith's cause of action for fear of cancer is a separate and distinct cause of action from his cause of action for small airways disease and organic brain disfunction. Butler v. Fidelity & Casualty Company of New York, 207 So.2d 805 (La.App. 1st Cir.1968). Mr. Smith's fear of cancer claim is entirely mental, and his cause of action arose when he began to fear cancer in the early 1970's. Therefore, the trial court committed legal error in not sustaining Dow's objection raising the peremptory exception of prescription as to the fear of cancer claim.

DECREE
Therefore, for the foregoing reasons, the trial court judgment is reversed and Mr. Smith's suit is dismissed. Costs are to be borne by Mr. Smith.
REVERSED.
WATKINS, J., concurs and assigns reasons.
CRAIN, J., concurs for the reasons assigned by WATKINS, J.
WATKINS, Judge, concurring.
I concur in the result reached by the majority for the following reasons:
It is elementary that DOW cannot be liable either primarily or vicariously[1] in tort to Mr. Smith. If Dow the corporate employer, breached a duty to its employee, such as a duty to provide a safe working place, then the employee was relegated to the remedy of worker's compensation. LSA-R.S. 23:1032. Thus, pursuant to the law in effect at the time of the defendants' alleged wrongful acts, the trial court was limited to finding an officer or employee at fault for plaintiff's damages. See Canter v. Koehring Company, 283 So.2d 716 (La.1973). In order to make this finding it must be shown that "[t]he principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought [and that] this duty is delegated by the principal or employer to the defendant." Canter v. Koehring Company, 283 So.2d at 721.
In the instant case I believe that the trial court erred in finding that the named defendants[2] had a duty toward the plaintiff, arising from a delegation by Dow, to prevent overexposure to vinyl chloride.
The plaintiff contends that the illnesses from which he now suffers were caused primarily by his overexposure to vinyl chloride while he was a dock worker for Dow from *334 1971 until 1974. During this time the industry standards for the exposure to vinyl chloride were governed by the Occupational Safety and Health Administration (OSHA). In 1970 the OSHA threshold limit value for vinyl chloride was 500 ppm (parts per million). In 1971 OSHA published a 500 ppm ceiling for vinyl chloride and in 1972, an eight hour time-weighted average of 200 ppm was recommended by OSHA. During this time Dow recommended 50 ppm.
The plaintiff's employment duties between 1971 until 1974 consisted of the loading of ships and barges with vinyl chloride. The procedures for loading ships with vinyl chloride included hooking up a valve on an intake hose from the plant to the ship's intake valve. The two valves were connected with a spool. An outtake hose from the ship back to the plant was also connected. When the intake hose was connected to the ship's valve, a small amount of vinyl chloride would occasionally remain in the hose and would leak out. However, the primary exposure to the vinyl chloride would occur when the intake hose would be disconnected from the ship. This procedure required the workers to "break" the connection between the two valves and slowly allow the vinyl chloride between the valves to vaporize into the atmosphere. Thereafter, the intake hose would be lifted by crane and placed over into the river and the flange covering the end of the hose would be removed to allow the vinyl chloride in the hose to evacuate.[3] Exposures would also occur when inhibitors were added to the vinyl chloride and when the workers were required to monitor the level of vinyl chloride being loaded into barges.[4] The workers were required to load vinyl chloride approximately four ships per month until 1973. Thereafter, the weekly loading included barges as well as ships. The workers explained that their exposures ranged from momentary inhalation to an extreme situation where a fog of the vapors would be present for 15 to 20 minutes. The supervisors were also in the loading area and were frequently exposed to the same vapors as the other workers. Neither the workers nor the supervisors wore respiratory protection during these normal operating procedures as they did not consider it to be necessary with the extent of vapors they were exposed to. The workers stated that when they would disconnect a line they would merely step away from the area until the vinyl chloride had vaporized into the atmosphere.
The Dow supervisors and employees testified that inhalation of vinyl chloride by workers was not a concern during the early 1970's. Instead their concern was the potential fire and explosion hazards of vinyl chloride.[5] To this end explosive meters were located on the docks to warn of vapor content that presented a fire or explosion hazard. No other monitors were present to continuously monitor the atmosphere for lower levels of vinyl chloride which might pose a health threat. According to Robert Vaughn, who was hired by Dow in 1957 to establish a safety program at the plant, part of his job function was taking air samples for exposures. Mr. Vaughn stated that his department did air testing and would obtain new samples whenever guidelines were changed or new procedures used. He stated that "we did the air sampling for each job to ensure us that we were below the fifty [parts per million guide level set by Dow]." Mr. Vaughn stated that they used procedures established at the time and accepted in the industry and that when they operated they felt comfortable with what they knew as far as the limits of exposure of most or all of the materials handled at the plants.[6] Later in 1974, when *335 OSHA requirements were lowered, their procedures were changed to stay in compliance.[7]
Mr. Vaughn's testimony was corroborated by Dr. V.K. Rowe, the director of the toxicology laboratory and industrial hygiene research,[8] in his testimony before the Occupational Safety and Health Administration on February 15, 1974, wherein he stated that in depth surveys conducted in 1973 revealed the at the Monomer Plant number 2, "[a]ll TWA values were below ten except for the laboratory employees. Their values were between ten and fifteen parts per million." Previous testing in the 1950's revealed time-weighted averages ranging from 9-60 parts per million.
Mr. Vaughn did not offer one instance where an employee would be required to wear a respiratory mask for normal operating procedures. The only instance that required the use of respiratory equipment was an emergency leak or spill. He stated that standard equipment consisted of monogoggles, glasses, hat, safety shoes, respirators according to the chemicals they were using, but not necessarily to wear, unless something was expected or if they had to evacuate. He later explained that the respirators were individual personal respirators called mouth bit respirators and that they were "not effective against any chemical, except in small amountsvery small amounts." Mr. Vaughn could not remember what the odor threshold was for vinyl chloride. With regard to measuring the presence and volume of vinyl chloride in the air Mr. Vaughn explained that they primarily used the color change tubes and air bags. The air bags consisted of a vacuum pump on a plastic bag, which sucks in the air around the workers' face. The bag is then taken to the lab and put on a chromatograph which measures the vinyl chloride present in the air sample. The color-change tube was normally worn around the workers neck and would absorb vinyl chloride throughout the work day. The tube was then analyzed for vinyl chloride content. The tube did not measure in parts per million volumetric limits, but would indicate the presence of vinyl chloride within a certain range. Neither of these methods would give an on the spot measurement of vinyl chloride. Mr. Vaughn explained that much more sophisticated measuring equipment was later developed but was not available in the early 1970's.
Although Dr. Currier, Dow's medical director, and Mr. Vaughn testified that the information concerning the threshold values for vinyl chloride and company policies regarding exposure are the types of things that supervisors would have knowledge of, neither man testified that any type of safety training program was in place at Dow with regard to how a supervisor would know that the threshold limit values for vinyl chloride had been exceeded.[9] No monitors were available at the dock and according to Mr. Vaughn all jobs were monitored by his department and approved as being within the 50 parts per million time weighted average.
The only written policies with regard to exposure by Dow employees to vinyl chloride were Dow's Material Safety Data Sheets introduced by the plaintiff. The 1970 data sheet under the heading "vapor contact at room temperature" states that:
single exposures exceeding ½ hour, or frequently repeated exposures of shorter duration may cause slight anesthesia and or slight systemic injury and or cause appreciable *336 but not intolerable irritation of respiratory passages.
Under the "precautions" section of the material data sheet the degrees of exposure are categorized as "no contact", "minor contact'" "occasional daily contact," and "gross contact likely." For "no contact" and "minor contact" the recommendation with regard to inhalation of vapor provides that "no precautions are necessary." "Occasional daily contact," is "[c]haracterized by manual handling of materials in packages such as bags, drums and fiberpays. Ventilation may be provided for specific jobs, many batch operations fall into this category." The recommended precaution for inhalation on "occasional daily contact" is "no precautions necessary for single exposures of less than ½ hour. Longer single exposures, or frequently repeated exposures will require a gas mask or respirator equipped with appropriate canister." The "gross contact likely" category is characterized by "hand operation, examples are emergency repairs, cleaning equipment, cleaning filters, taking care of spills, packaging volatile or dusty materials without ventilation, wheeling and tray drying." The stated precautions are "evacuate area at once and enter only with airline respirator, blower mask or chemox mask." The comments section of the 1970 data sheet states that "[v]apor exposures which cause `dizziness' should be avoided."
The 1972 Dow Material Safety Data Sheet[10] states that "[v]apors can form flammable and explosive mixtures with air at all normal ambient temperatures. All sources of ignition should be avoided in areas where vinyl chloride vapors are present." Under the heading "inhalation (TLV or suggested control figure)" the form states "TLV500 ppm (1970); may be lowered to 200 ppm in 1972." The effects of overexposure are "[l]ower concentrationdizziness & drunkenness, possibly lung irritation. High concentrationanesthetic effect." The data sheet advised to dispose of vinyl chloride as a vapor, venting to an area free of any source or ignition. With regard to respiratory protection the data sheet advises that no protection is required up to the TLV. Once the TLV is reached for ½ hour or less, a full face gas mask and canister are required. For greater exposures a self-contained breathing apparatus is required.
In 1973 the material safety data sheet listed the Threshold Limit Value as 200 ppm, however, Dow recommended using a guide level of 50 ppm.[11] The precautions remained the same as those published in 1972.
The only evidence which would tend to establish over exposure is the testimony of the employees that they could often smell vinyl chloride while they worked and that sometimes they would be working in a fog of vinyl chloride.[12] However, the evidence shows that the odor threshold for vinyl chloride is somewhere between 250 ppm and 4000 ppm and that the industry threshold limit value for vinyl chloride in 1970 was 500 ppm. In 1971, OSHA published a 500 ppm ceiling for vinyl chloride, and in 1972, a time weighted average of 200 ppm was recommended by OSHA with Dow recommending a "guide level of 50 ppm". While I recognize that the workers may have been exposed to levels of vinyl chloride which were in excess of the 50 ppm guide level set by Dow, these exposures were intermittent and of limited duration occurring approximately once a week during the loading of barges and ships. Furthermore, to determine actual exposure for monitoring purposes the exposures must be time-weighted over an 8-hour period to obtain the average ppm.[13] Without more *337 definitive evidence it is impossible to determine the time-weighted average of the plaintiff's exposures.

CONCLUSION
Although the workers and supervisors testified that they were responsible for the safety of their men, this responsibility cannot be held to extend to situations of which the supervisors were not aware, or were not adequately trained or equipped to handle. In order to establish a delegation of Dow's duty to provide a safe place to work the plaintiff must show that one of the named defendant's was aware of the danger of overexposure and that the defendant knew or should have known that the plaintiff was being overexposed. It is important to note that the exposures of which the plaintiff complains occurred within the normal operating procedures which the dock supervisors were trained to perform. They were not informed that these procedures would expose their men to dangerous levels of vinyl chloride, to the contrary the testing performed by the safety department indicated that the jobs performed at the plant were all within satisfactory limits for exposure. I can find no testimony that the named defendants were charged with the duty to monitor exposure levels, implement different safety procedures, or design new loading procedures to lessen the exposure to vinyl chloride. Perhaps the most telling evidence of the lack of knowledge of the dock supervisors is their willingness to be exposed to the vinyl chloride which the plaintiff now claims they knew was dangerous to his health.
Under these facts I do not believe that the plaintiff proved his case.
For the foregoing reasons, I concur in the reversal of the trial court judgment.
NOTES
[1] Mr. Smith also named as defendants Georgia-Pacific Corporation and Phillips Petroleum Corporation. These two defendants were dismissed by Smith before trial.
[2] We note that in plaintiff's original petition, the named defendant is "Mark Courrier," but that in the "Stipulation, Order and Judgment of Partial Dismissal" this defendant is referred to as "Mark Currier (Mort Currier)", and obviously refers to Dr. Mortimer F. Currier, who is referred to at various times in the record as "Dr. Mortimer Currier," (record p. 100, Memorandum In Opposition To Defendant's Motion For Summary Judgment), and "Mortimer Currier" (record p. 131, Plaintiff's Post-Trial Memorandum).
[1] The liability of a servant for his tort is primary; the liability of a non-negligent master for the servant's tort is derivative, or secondary. Williams v. Marionneaux, 240 La. 713, 124 So.2d 919 (1960), overruled on other grounds, Sampay v. Morton Salt Company, 395 So.2d 326 (La.1981).
[2] The plaintiff named the following individual defendants in his petition and amending petition: Richard Brownsfield, Tony Grant, Carl Mercer, Mark Courrier, Curtis Pitre, Noland Blanchard, John Breaux, Don Smith, L.O. Holden, Al Kirby, Jim McBride, Al Peridiso and Dick Beard.
[3] The hose required draining after loading due to the propensity of vinyl chloride to become pressurized if it remained in the hose exposed to sunlight.
[4] The workers experienced more exposure in loading barges because the barges came in without a crew to monitor the tanks on board.
[5] According to the American Industrial Hygiene Association, "[p]rior to 1974, the primary hazard of occupational exposure to vinyl chloride was considered to be due to its anesthetic and explosive properties. There was conflicting opinion as to the significance of pathological changes in the liver of dogs, guinea pigs, rabbits and rats exposed for periods up to six months."
[6] Although Mr. Vaughn explained that they were comfortable with the exposure levels, he was not asked nor did he offer any information as to what the exposure levels were for the loading of vinyl chloride.
[7] It was at this time that a full-time Industrial Hygiene Department was established and Charles E. Halphen was hired as the Division Industrial Hygienist. His primary function was monitoring employee exposures which he stated had been previously performed on a part-time basis by Robert Vaughn along with his duties as safety director.
[8] In late 1973 Dr. Rowe, became a research scientist concerned with the over-all, broad aspects of Dow's health and environmental research.
[9] The testimony of Noland Blanchard, who became the plaintiff's supervisor in 1973 stated that with regard to safety training in terms of the interaction of the employees with vinyl chloride, "[w]e had no training. Well, we had noI guess we didn't even think about it. We didn't have any kind of procedures or safety rules or safety procedures or anything along those lines back then."
[10] The format of the data sheet changed from that used previously, eliminating the specific precautions as to levels of exposure.
[11] It is important to note that the threshold limit values are time weight figures over an 8-hour work day. These are distinguishable from ceiling values which are peak permissible exposures regardless of the amount of time the worker is exposed.
[12] The plaintiff also related one incident where he and a co-worker became drunk from exposure. He and the co-worker were removed from the dock.
[13] The apparent lack of knowledge concerning permissible exposure levels is evidenced by the confusion of the Dow employees with regard to the difference between ceiling exposure levels and time-weighted exposure levels. The evidence reveals that the employees as well as the supervisors either did not know what any of the permissible exposure levels were or they were confused as to whether the 50 ppm time-weighted guide level was also a ceiling level as well.